668 F.2d 725
 32 UCC Rep.Serv. 1073, 9 Fed. R. Evid. Serv. 1213
 FIRST NATIONAL STATE BANK OF NEW JERSEY, Assignee of Wiltek
Leasing, Inc.
v.
RELIANCE ELECTRIC COMPANY, a Corporation authorized to do
business in New Jersey First National State Bank
of New Jersey, Appellant.
 No. 81-1508.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 13, 1981.
Decided Dec. 30, 1981.
 
 Arthur C. Linderman (argued), Jeremy Galton, Raff, Scheider & Wiener, Newark, N.J., for appellant.
 Benjamin P. Michel (argued), Riker, Danzig, Scherer & Hyland, Newark, N.J., for appellee.
 Before HUNTER, ROSENN, and WEIS, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM.
 
 
 1
 This diversity case, removed from the Superior Court of New Jersey to the United States District Court on the petition of the defendant, Reliance Electric Co. (Reliance), pursuant to 28 U.S.C. § 1441, is now before us on an appeal by the First National State Bank of New Jersey (the Bank) from the judgment of the United States District Court for the District of New Jersey. Plaintiff's claims and defendant's counterclaim were tried to a jury which made special findings and specifically found "(t)hat neither party is entitled to damages." The Bank filed motions seeking judgment notwithstanding the verdict or in the alternative a new trial. The trial Judge, Chief Judge Fisher, denied the motions and the Bank appealed. We affirm.
 
 I.
 
 2
 On September 29, 1976, Reliance, which has its principal place of business in Cleveland, Ohio, entered into a Master Lease Agreement with Wiltek Leasing, Inc. (Leasing). Leasing is a wholly owned non-operating subsidiary of Wiltek, Inc. (Wiltek), and the two corporations have common officers. Under the lease, which provided that New York law would govern the agreement, Reliance leased certain telecommunication equipment from Leasing for use in transmission and receipt of its inter-company communications. The parties understood that Wiltek would manufacture the equipment; Leasing's sole corporate function was to execute lease documents with Wiltek's customers, hold title to the leased Wiltek equipment, and serve as a conduit through which funds would pass to Wiltek.
 
 
 3
 Under the terms of the Master Lease entered into between Leasing and Reliance, Reliance agreed to pay a monthly rental commencing February 1, 1977, of $9,650 for a period of 60 months. It also executed a Service Agreement with Wiltek, the manufacturer, dated September 29, 1976, under which Wiltek agreed to service the leased equipment at a monthly service rate of $3,770 beginning on February 1, 1977. In addition, Reliance signed a Certificate of Acceptance by which it certified that the equipment referred to in the attached schedule was "accepted as satisfactory in all respects." Reliance claimed and the evidence established that the Certificates of Acceptance did not acknowledge delivery of the equipment but only that the equipment modules listed in the schedules "were acceptable." Reliance executed another lease on October 29, 1976, for additional equipment referred to in the schedule attached to that agreement and another Certificate of Acceptance. The second lease made deletions and additions to the schedule attached to the first lease. By the terms of each of the two certificates, the "Initial Payment Date" was fixed at February 1, 1977.
 
 
 4
 Leasing executed non-negotiable promissory notes on October 12, 1976, and November 2, 1976, in sums of $579,000 and $128,000 respectively, payable to the Bank in 60 monthly installments commencing February 1, 1977. On the basis of these notes, which were coterminous with the Reliance leases and accompanied by certain collateral documents, the Bank made substantial loans to Leasing which are the genesis of this litigation. Although the equipment had not yet been manufactured, the collateral documents consisted of bills of sale from Wiltek to Leasing, security agreements which purported to give the Bank a lien on the equipment leased to Reliance, an assignment of the Reliance leases, and the rental money due under them.
 
 
 5
 Each of the promissory notes executed by Leasing to the Bank contained a provision that the obligation to repay was to be satisfied solely from the rental payments due under the lease from Reliance. By letters dated October 27, 1976, and November 9, 1976, the Bank notified Reliance of the assignment of the leases and the amount of the rental payments due commencing February 1, 1977. The letters did not disclose, however, that the Bank had advanced monies on the basis of the assignments and did not direct the payment to it of the rentals.
 
 
 6
 Unfortunately, the equipment was never delivered to Reliance and Reliance never made the payment due on February 1, 1977, or any rental payments called for in the lease agreements. On February 2, 1977, Wiltek filed an involuntary petition in bankruptcy. In August 1977, the Bank instituted these proceedings to recover the rental payments due under the leases in the sum of $707,100, attorney's fees, and interest. Reliance charged the Bank with fraud and conspiracy and filed a counterclaim for damages allegedly sustained by it because of Leasing's failure to honor its contractual obligations to Reliance.
 
 
 7
 Although on appeal the Bank raises eight issues, they can be distilled into two arguments: (1) the bank had status similar to that of a holder in due course and Reliance is therefore not entitled to assert the defense of the failure of consideration; (2) the testimony of Homer Kripke, an expert witness, was improperly admitted into evidence.
 
 
 8
 At trial, the Bank claimed that as allowed by section 9-206 of the Uniform Commercial Code (UCC)[1] Reliance waived all defenses to payment of rent to an assignee of the lease by undertaking an unconditional obligation to make the rental payments to any such assignee as set forth in paragraph 2 of each of the leases. The Bank emphasized that the waiver extended to the non-delivery of the non-existent equipment. The Bank's theory at trial in support of its claim was that Reliance entered into this unusual arrangement and assumed the absolute risk of total liability because it was anxious to lease the equipment and through this arrangement Wiltek was provided the money necessary for manufacturing the equipment. In effect, the Bank argued that Reliance was willing to permit Wiltek to make use of Reliance's credit as a way of obtaining the funds necessary for the manufacture of the telecommunications equipment which Reliance was so anxious to lease. The jury implicitly rejected the Bank's contentions. We have carefully examined the record and find no plausible evidence whatever to support the Bank's theory.
 
 
 9
 First, Reliance had no contact whatsoever with the Bank in arranging the proposed loan to Leasing, its terms or conditions. Second, no sophisticated national corporation would have entered into a transaction to finance the manufacture of equipment for it without taking conventional precautions to protect itself against the risks involved. For example, Reliance might have demanded that the funds be set aside for this specific purpose and that the Bank obtain a lien against the materials and equipment during manufacture, advancing money to Wiltek only as needed for manufacturing. No protective procedures were discussed or provided. Third, Wiltek's primary lender and the company upon which it could be expected to call for loans for manufacturing purposes was not the Bank but the Chemical Bank of New York. Fourth, the Bank took the assignment of the first Reliance lease on October 13, 1976, and on October 18, 1976, made a loan to Leasing of $444,226.68. This sum went directly into Wiltek's account at the Bank without any inquiry as to arrangements for the manufacture of the equipment. It made an additional loan of $98,788.08 on November 4, 1976, and in the same fashion. However, the Bank had previously advanced Wiltek $331,585.22 against an Amstar lease which turned unsatisfactory and which Wiltek cancelled. The Bank thereupon cancelled the loan made on the basis of the Amstar lease and, according to the Bank's vice president, obtained payment of this obligation by withdrawing on October 18, 1976, the sum of $331,585.22 from the funds credited to Wiltek's account on the Reliance lease. Had not Wiltek been credited on the Reliance transaction on October 18, the Bank could not have obtained payment on Wiltek's Amstar debt. The Wiltek account would have been short of the $331,585.22 by approximately $200,000. Thus, there is an abundance of evidence to show that the funds generated by the Reliance lease were not intended for the specific manufacture of the Reliance equipment. Furthermore, it must be noted that this transaction could not have provided for a loan to enable Wiltek to manufacture the equipment because the collateral covered by the leases and other documents apparently referred to finished goods, not raw materials and work in progress.
 
 II.
 
 10
 Not only does the evidence belie the Bank's rationale for Reliance's alleged unconditional agreement to pay, but it also precludes the Bank from enforcing any such agreement on Reliance's part. Under UCC 9-206, a waiver of defense clause such as that the Bank asserts Reliance made,[2] can be enforced with certain exceptions, only by an assignee who takes his assignment for value in good faith and without notice of a claim or defense, i.e., someone with a status similar to that of a holder in due course.[3] Thus, even if Reliance did waive all defenses (and the jury found that it did not),[4] the Bank could force Reliance to make the rental payments only if it had status like that of a holder in due course.
 
 
 11
 At trial, the court submitted six interrogatories to the jury which the parties agreed were dispositive of all the issues. In response, the jury made the following findings:
 
 
 12
 1. That the transaction was a loan to be secured by a lease of equipment that was supposed to have been delivered to the defendant, Reliance Electric, at some time in the future;
 
 
 13
 2. That the plaintiff, First National State Bank, knew or should have known when the bank took assignment of the lease from Wiltek, that the equipment had not been delivered;
 
 
 14
 3. That the defendant, Reliance Electric, only agreed not to assert problems of delivery as a defense to payment;
 
 
 15
 4. That although the plaintiff and the defendant are both essentially innocent of wrongdoing, the plaintiff, First National State Bank, contributed more to the loss;
 
 
 16
 5. That the plaintiff, First National State Bank, did not defraud the defendant, Reliance Electric; and
 
 
 17
 6. That neither party is entitled to damages.
 
 
 18
 William R. Norton, assistant secretary and in-house counsel for Reliance, gave testimony on the distinction in the lease agreement between non-waiver of delivery of the equipment and the waiver of problems of actual physical delivery. There was evidence, therefore, to support finding number three and, as the recipient of the verdict, the defendant is entitled to the benefit of all inferences on appeal. The findings of the jury that the Bank knew the equipment had not been delivered are thus dispositive of the Bank's right to assert a claim under section 9-206 if there is sufficient evidence to support them. We have carefully reviewed the record and we are persuaded that there is.
 
 
 19
 As noted above, under Section 9-206 of the UCC, an assignee for value of a lease cannot attain status akin to that of a holder in due course and enforce a waiver of defense clause if it has either notice of a defense or has, by its own conduct, created the risk of loss that would be imposed on an innocent third party. It not only must act in good faith, but in a commercially reasonable fashion. The evidence shows that the Bank had notice of a defense and did not act in a commercially reasonable fashion.
 
 
 20
 From 1974 through 1976, the Bank was the largest source of funding for Wiltek and Leasing. As of March 4, 1975, it held notes of Leasing in the sum of approximately $7,600,000. The Bank knew or should have known that Wiltek was in financial difficulties during these years; Wiltek had substantial net losses and sales had declined. Immediately before the Reliance loan, the Bank had cancelled the debt arising out of the transaction with Amstar Corporation. In June 1976 a lease had been assigned to the Bank between Leasing and Central Soya Corp. accompanied by a Certificate of Acceptance signed by Soya on June 4, 1976. When the Bank later in June notified Soya of the assignment, Soya informed the Bank that rental payments would not be made until Wiltek installed the equipment and it was in good working order. Thus, the Bank knew that Wiltek was borrowing against leases for undelivered equipment.
 
 
 21
 This was the background against which the Bank acquired the Reliance documents. The Bank's senior vice president, Matthews, testified at trial:
 
 
 22
 Q: In fact, sir, you would not have gone forward with any of these advances if the Bank was not convinced that delivery of the goods had already taken place, would you, sir?
 
 
 23
 A: If the lessee expected delivery, we would not have gone forward, yes sir.
 
 
 24
 Q: Forget what the lessee expected, sir. I am speaking from the point of view of the Bank. You, as the officer in charge of these loans, would not have approved one dollar going to Wiltek if you did not believe that the equipment had been delivered, is that correct, sir?
 
 
 25
 A: Unless the lessee was willing to accept some other arrangement.
 
 
 26
 Similarly, the Bank's expert, Riskie, testified that in the ordinary lease-loan transaction, delivery of the underlying equipment is "by all means" important. Yet Matthews acknowledged that in the Wiltek loan "(w)e got no specific document that referred to delivery." And the structure of this entire transaction revealed that the equipment had not been delivered and that delivery was to take place at some future date. That was the substance of Riskie's testimony. The record demonstrates that the Bank evinced no interest in ascertaining whether the equipment had even been manufactured, let alone delivered.
 
 
 27
 Neither Certificate of Acceptance purports to acknowledge delivery of the equipment. Each Certificate of Acceptance was executed simultaneously with the execution of a corresponding equipment lease which specifically provided that "(A)fter Lessor's execution of this Lease Agreement, Lessor or its assigns will order the equipment from Wiltek, Inc., and/or other specified supplier ("Supplier")."[5] The bills of sale from Wiltek to Leasing for the equipment were dated October 13, 1976, and November 2, 1976, and neither identify any of the equipment. They could not have because the equipment did not exist. In the schedules attached to the security agreements the equipment was identified only by model number. That in itself should have made the Bank suspect that it was making a loan against equipment not yet delivered or even manufactured. In fact, the Bank's security agreement warranted that the equipment covered by the lease "has been or will be delivered to the Lessee." No certificates of delivery accompanied the documents. And yet the Bank's expert, Riskie, stated that a lender in the normal situation "would have a delivery and acceptance document of some kind." The leases were assigned to the Bank shortly after their execution but on the face of the documents rental payments were not to commence for over four months. Thus, the documents in themselves were sufficient to put a sophisticated lender with knowledge of Wiltek's marketing practices on notice that delivery of the equipment to the lessee was to be made sometime in the future. In fact, Riskie testified that anyone familiar with lease financing would read the documents to call for future delivery.[6] Yet, the Bank conceded at trial that it made no attempt whatsoever, either through Wiltek, Leasing, Reliance, or any other source, to ascertain whether the leased equipment had been delivered or even manufactured. The jury might well have found such behavior on the part of a lending institution strange.
 
 
 28
 The jury's findings are also supported by evidence that the Bank knew it was Leasing's practice to make assignments before delivery of the equipment involved in the transaction and that Leasing's customers routinely signed certificates of acceptance on standardized forms before delivery was made. The jury could also have found it incongruous for an assignee in good faith not to have advised Reliance that it had advanced substantial sums on the strength of Reliance's lease and that rental payments were to be made directly to the Bank. The first Bank communicated with Reliance pertaining to payments was a telephone call on December 14, 1976, several days after Wiltek's controller had informed the Bank's vice president, Matthews, that Wiltek was out of cash and unable to continue operations. On December 15, 1976, the Bank informed Reliance for the first time that Wiltek had not manufactured the equipment alluded to in the Reliance lease.
 
 
 29
 Thus, there was sufficient evidence from which the jury could infer that the Bank was not an assignee who took the lease without notice of a claim or defense and was not entitled to enforce the waiver of defense clause.[7] We therefore conclude that the jury's findings are well supported by the record and should not be set aside.
 
 III.
 
 30
 The Bank also complains that permitting Homer Kripke, acknowledged as an outstanding scholar and a foremost expert on the Uniform Commercial Code, to testify as to trade usage "in light of the clear unambiguous nature of the documents" constituted reversible error.
 
 
 31
 Prior to trial the Bank by motion sought to bar Kripke's testimony on the ground that it would usurp the role of the judge and jury. In a written opinion Chief Judge Fisher, noting the wide discretion district courts have in determining the admissibility of expert testimony, held that Kripke's expert testimony would be appropriate in this case to inform the jury of bank customs and to assist it in determining the pivotal issue of whether the Bank was entitled to claim the benefits of a holder in due course. He concluded that:
 
 
 32
 Bank's acceptance of a lease that contained a certificate of acceptance before goods were delivered may have transcended the established custom in the banking industry and could indicate that Bank lacked good faith and/or had notice of claims, thereby denying it holder-in-due-course status. Consequently, Kripke must be able to testify on the custom in the banking industry to facilitate said determination. Kripke should not, however, give his opinion as to the legal duties arising therefrom.
 
 
 33
 This ruling is supported by Federal Rule of Evidence 702.
 
 
 34
 The Bank's contention that this testimony should not have been permitted in the face of documents that were clear and unambiguous has little merit. First, the trial judge permitted the testimony to provide the jury with information on bank customs and to assist the trier of fact with bank and industry practices. Second, it provided information on whether the Bank's conduct warranted status akin to that of a holder in due course in light of banking practices. Third, the Bank used its expert for substantially similar purposes. Finally, there obviously was ambiguity in the documents concerning the prior delivery of the equipment before the lessee was obligated to pay any rental. In light of the conflicting theories of the parties concerning delivery, the testimony was relevant and we see no grounds for reversible error.
 
 
 35
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Section 9-206-(1) provides:
 (1) Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Article on Commercial Paper (Article 3). A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement.
 
 
 [2]
 The provisions of the lease relied on by the Bank in making this claim are paragraph 3 which provides that "Lessee (Reliance) agrees that Lessor (Leasing) or its assigns is not responsible or liable for (a) delivery ..." and paragraph 5 which provides "Lessee agrees to assume and does hereby assume all risk of loss and liability ... arising from or pertaining to the installation, design, use, possession, operation, delivery, or service of the equipment ...."
 
 
 [3]
 An assignee under section 9-206 is not technically a holder in due course since he is not the holder of a negotiable instrument. See UCC §§ 3-302; 1-201; 3-102(1)(e). Section 9-206 bestows upon assignees of a lease or agreement of sale the same privileged position which holders in due course of negotiable instruments enjoy if the lessee or buyer explicitly waives defenses against assignees in the lease or sale agreement
 
 
 [4]
 Reliance contended at trial and in this court that the provisions of the agreement relied on by the Bank were not intended to operate as a waiver of Leasing's obligation to deliver the equipment but only as a waiver of the right to assert as a defense to payment some problem in connection with the actual physical delivery, such as late delivery, delivery to an incorrect location, or damage to the equipment in the course of delivery
 
 
 [5]
 Joseph W. Fitzpatrick, a vice president of Wiltek, testified that he and Matthews discussed the Certificate of Acceptance and that it evidenced the customer's acceptance of the equipment, but not delivery of the equipment
 
 
 [6]
 The Bank concedes in its brief filed with the court that "the Lease and related documents clearly called for delivery in the future."
 
 
 [7]
 Under facts very similar to those here, the court in Associates Discount Corp. of Iowa v. Fitzwater, 518 S.W.2d 474 (Mo.Ct.App. 1974), reached a similar result. The assignee of a note and chattel mortgage given in connection with the purchase of a tractor sued defendant company and its former employee for failure to make payments due under the note. The Missouri Court of Appeals found that the evidence showed the assignee knew that the state consideration for the note-a tractor-had not been delivered. Therefore, the court held that under section 400.9-206 of the Missouri Revised Statutes (the state apparently having adopted the Uniform Commercial Code) the assignee, because it had knowledge of a defense, could not enforce the waiver of defense clause contained in the documents