262 F.3d 923 (9th Cir. 2001)
 LOUIS G. NAVELLIER, AN INDIVIDUAL AND TRUSTEE AND SHAREHOLDER OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST); ROSEMARY J. MCLACHLAN; MARTIN BILLETT; WILLIAM RAUTENBERG; FAITH C. RAUTENBERG; MARK SCHULZ; GAIL SULLIVAN; THOMAS SULLIVAN, PLAINTIFFS-APPELLANTS,
v.
KENNETH SLETTEN, AN INDIVIDUAL AND TRUSTEE OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST); DONALD SIMON, ET AL., DEFENDANTS-APPELLEES.
LOUIS G. NAVELLIER, AN INDIVIDUAL AND TRUSTEE AND SHAREHOLDER OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST); ROSEMARY J. MCLACHLAN; MARTIN BILLETT; WILLIAM RAUTENBERG; FAITH C. RAUTENBERG; MARK SCHULZ; GAIL SULLIVAN; THOMAS SULLIVAN, PLAINTIFFS-APPELLANTS,
v.
KENNETH SLETTEN, AN INDIVIDUAL AND TRUSTEE OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST); DONALD SIMON, ET AL., DEFENDANTS,
And
ARNOLD SCOTT; ROY ADAMS; MASSACHUSETTS FINANCIAL SERVICES, DEFENDANTS-APPELLEES.
ROSEMARY J. MCLACHLAN, ET AL.; LOUIS G. NAVELLIER, AN INDIVIDUAL AND TRUSTEE AND SHAREHOLDER OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST); MARTIN BILLETT; WILLIAM RAUTENBERG; FAITH C. RAUTENBERG; MARK SCHULZ; GAIL SULLIVAN; THOMAS SULLIVAN, PLAINTIFFS-APPELLEES,
v.
KENNETH SLETTEN, AN INDIVIDUAL AND TRUSTEE OF THE NAVELLIER SERIES FUND (RECENTLY RENAMED THE MFS SERIES TRUST), DEFENDANT-APPELLANT,
AND
DONALD SIMON, DEFENDANT.
 Nos. 99-17059, 99-17061, and 99-17388
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 10, 2001
Filed August 27, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Samuel Kornhauser, San Francisco, California, for the plaintiffs-appellants.
 Ralph C. Alldredge, Emeryville, California, Jonathan C. Dickey, Gibson, Dunn & Crutcher, Palo Alto, California, Jacquelyn J. Garman, San Francisco, California, Vincent P. Finigan, Jr., Brobeck, Phleger, & Harrison, San Francisco, California, for the defendants-appellees.
 Christopher Paik, Securities and Exchange Commission, Washington, D.C., for the amicus curiae.
 Appeal from the United States District Court for the Northern District of California; William H. Orrick, Jr., District Judge, Presiding. D.C. No. CV-97-01258-WHO.
 Before: William C. Canby, Jr., Michael Daly Hawkins, and Ronald M. Gould, Circuit Judges.
 Ronald M. Gould, Circuit Judge:
 
 OPINION
 
 1
 This appeal follows an Investment Company Act of 1940 ("ICA") action seeking to impose personal liability on the independent trustees of a mutual fund for the non-renewal of an investment advisory contract. After a fourteen-day trial, the jury determined that the independent trustees acted within their discretion under the business judgment rule in replacing the investment adviser.
 
 
 2
 Plaintiffs-Appellants are: (1) shareholders and former shareholders of the Navellier Series Fund ("Fund"); (2) the original investment adviser of the Fund, Navellier Management, Inc. ("NMI"); and (3) Louis Navellier, an interested trustee of the Fund (collectively, "appellants"). Defendants-Appellees are: (1) three former independent trustees of the Fund -Donald Simon, Kenneth Sletten, and Lawrence Bianchi (collectively, "independent trustees"); (2) Roy Adams, counsel for the independent trustees; (3) Massachusetts Financial Services ("MFS"), former investment adviser of the Fund; and (4) Arnold Scott, former trustee of the MFS Series Trust (collectively, "appellees").
 
 
 3
 Appellants challenge the district court proceedings on numerous grounds, complaining about pre-trial, trial, and post-trial rulings. Sletten cross-appeals both an imposition of sanctions against him and his counsel, and the dismissal of his counterclaim for breach of contract. We reject all of appellants' many claims, uphold the jury verdict exonerating the independent trustees, and affirm the judgment of the district court against appellants. On Sletten's cross-appeal, we affirm dismissal of his counterclaim but grant limited relief, holding that the district court abused its discretion in affirming the imposition of sanctions against cross-appellant Sletten and his counsel.
 
 FACTS AND PROCEDURAL BACKGROUND
 
 4
 On May 15, 1993, Navellier organized the Fund as a Delaware business trust that would invest in an open-ended investment company or mutual fund. Navellier and one of his employees, Jack Drinkwater,[1] served as interested trustees, while Simon, Sletten, and Bianchi served as independent trustees.[2] Sam Kornhauser, Navellier's attorney, was hired as Fund counsel.[3]
 
 
 5
 On the day the Fund was organized, the Fund entered into an investment advisory agreement with NMI. Under this agreement, NMI provided investment advice and managed the Fund's assets. The initial term of the investment advisory contract was two years, annually renewable if approved by a majority of the independent trustees.
 
 
 6
 In January 1995, the independent trustees sought independent counsel. In October 1995, they hired Adams, an experienced mutual fund attorney, as independent counsel. Adams advised the independent trustees that, to fulfill their fiduciary obligations to the shareholders of the Fund, it was necessary to obtain certain financial information about NMI in order to conduct their annual review of the investment advisory agreement. Adams also told the independent trustees that he had concern about Kornhauser's abilities. Adams expressed the opinion that Kornhauser should not continue as counsel for the Fund while he remained counsel for NMI, Navellier, and Navellier's other businesses.
 
 
 7
 At a board of trustees' meeting on April 26, 1996, Navellier presented a motion to the trustees of the Fund to merge the Fund into the Navellier Performance Funds. This merger would have been a tax-free reorganization. The assets of the Fund would have been transferred to a portfolio of the Navellier Performance Funds in exchange for the shares of the Navellier Performance Funds. The merger would have terminated the independent trustees' positions.
 
 
 8
 The independent trustees deferred consideration of Navellier's merger proposal because they concluded that"further consideration would be premature given that the disinterested Trustees did not have any advance notice or information as to the relative merits of the proposal." The next order of business for the meeting was the annual review of the investment advisory agreement. The independent trustees expressed frustration at being asked to review and approve the investment advisory agreement without having received requested information from Kornhauser or NMI. The independent trustees then voiced their concern as to whether Kornhauser should continue as counsel to the Fund. A contentious discussion ensued, after which Navellier threatened to terminate his relationship with the Fund and left the meeting. The independent trustees then voted to remove Kornhauser as counsel to the Fund.
 
 
 9
 The independent trustees conditioned their future consideration of the merger proposal on review of certain information concerning the finances of Navellier and his companies. After Navellier refused to provide this information, the independent trustees contacted the Securities and Exchange Commission ("SEC") in an effort to compel Navellier to produce the information. This effort to obtain the SEC's assistance in compelling this information did not succeed. Thereafter, the independent trustees decided to put Navellier's proposed merger to a shareholder vote by way of a proxy prepared by NMI.
 
 
 10
 Pending resolution of the merger proposal, the independent trustees held a board of trustees meeting on March 13, 1997, and voted not to renew NMI's investment advisory contract, which was scheduled to expire by its terms on March 15, 1997. The independent trustees also voted to hire MFS as the Fund's investment adviser. MFS conditioned its agreement to become investment administrator on assurances that the current trustees would not continue as trustees after the vote of the Fund's shareholders.
 
 
 11
 Navellier and Alpers filed a complaint on April 9, 1997, seeking to enjoin the independent trustees from removing them as interested trustees. Navellier also requested injunctive relief to block the investment advisory agreement with MFS so NMI could regain its former position as investment adviser.
 
 
 12
 On April 10, 1997, the independent trustees voted to remove Navellier and Alpers from their positions as interested trustees. According to appellants, the independent trustees undertook this allegedly wrongful act to entrench themselves more completely, to neutralize opposition to their upcoming proxy, and to ratify their decision to hire MFS. The independent trustees then eliminated the two positions formerly held by Navellier and Alpers, reducing the trustees of the Fund.
 
 
 13
 On May 23, 1997, after the reorganization of the board of trustees, a shareholder vote was held to determine whether MFS should continue as investment adviser to the Fund. The proposal to retain MFS failed, receiving less than the required two-thirds vote of shareholders. Navellier refused to return to the Fund unless the independent trustees released him from liability and agreed to resign as trustees. The independent trustees signed a release, returned management of the Fund to NMI, and resigned.
 
 
 14
 On February 24, 1998, appellants filed a first amended class action complaint. The amended complaint alleged the following claims: (1) breach of fiduciary duty under the ICA and Delaware law against the independent trustees, MFS, and Scott; (2) breach of fiduciary duty and negligence under California law against Adams; and (3) waste and intentional interference with prospective economic advantage against all defendants. The independent trustees answered and filed a counterclaim for indemnity. Sletten also filed a separate counterclaim for breach of contract and bad faith. The district court made several pre-trial rulings, which left for trial only appellants' claims for breach of fiduciary duty and waste against the independent trustees and the independent trustees' counterclaims for indemnification. The district court later dismissed appellees' indemnity counterclaims without prejudice on appellees' motion.
 
 
 15
 Jury trial commenced on June 21, 1999. After a fourteenday trial, the jury returned a unanimous verdict for the independent trustees on all claims. The district court entered judgment on August 24, 1999. On September 8, 1999, appellants filed motions for judgment as a matter of law and for a new trial. The district court denied both motions. This appeal and cross-appeal followed.
 
 DISCUSSION
 I. Pre-Trial Rulings
 A. Dismissal of claims against Adams
 
 16
 Appellants contend that the district court erroneously dismissed the claims against Adams for breach of fiduciary duty and negligence pursuant to Federal Rule of Civil Procedure 12(b)(6). We disagree.
 
 
 17
 We review de novo a district court's dismissal of a complaint for failure to state a claim upon which relief can be granted. Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). "A key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant. Absent duty there can be no breach and no negligence." Goldberg v. Frye , 217 Cal. App. 3d 1258, 1267 (1990). See also Skarbrevik v. Cohen, England & Whitfield, 231 Cal. App. 3d. 692, 701 (1991) ("An attorney generally will not be held liable to a third person not in privity of contract with him since he owes no duty to anyone other than his client.").
 
 
 18
 Applying California law, which the parties agree is controlling here, the California Supreme Court has explained that the determination of whether the duty undertaken by an attorney extends to a third person not in privity involves the balancing of various factors. These factors include: (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to him," (3) "the degree of certainty that the plaintiff suffered injury," (4)"the closeness of the connection between the defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm." Goodman v. Kennedy, 556 P.2d 737, 742 (Cal. 1976) (internal quotation marks and citation omitted).
 
 
 19
 Applying these factors here, the district court correctly held that Adams, by advising the independent trustees, did not assume a duty of care to the Fund's shareholders. The district court reasoned that the shareholders were not the intended beneficiaries of Adams' counsel to the independent trustees; the harm alleged by the appellants (i.e., capital gains taxes) was not a foreseeable result of Adams' conduct; the connection between Adams' advice to the independent trustees and the alleged injury was remote and tenuous; no moral blame could be attached to Adams' conduct in advising the independent trustees of their obligations under the law; and strong public policy reasons militated against finding any duty owed by Adams to the shareholders.
 
 
 20
 We see no sound basis for disagreement with this analysis. Adams was representing the independent trustees. Nothing in that relationship suggested that he owed a duty to the shareholders of the Fund. To imply such a duty would be contrary to the sound policy requiring his undivided loyalty to his clients. We hold that the district court properly dismissed appellants' claims against Adams for breach of fiduciary duty and negligence.
 
 
 21
 B. Dismissal of ICA claims against MFS and Scott
 
 
 22
 Appellants contend that the district court erroneously dismissed their claims against MFS and Scott for breach of fiduciary duty under the ICA pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court addressed three theories in dismissing appellants' claims against MFS and Scott for breach of fiduciary duty under the ICA. We address each theory in turn.
 
 1. Fiduciary Duty
 
 23
 The ICA expressly provides that decisions regarding the renewal of investment advisory contracts are within the sole discretion of a fund's independent trustees.
 
 
 24
 [I]t shall be unlawful for any registered investment company having a board of directors to . . . renew . . . any contract or agreement . . . whereby a person undertakes regularly to serve or act as investment adviser . . . for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party . . .
 
 
 25
 15 U.S.C. §§ 80a-15(c) (emphasis added).
 
 
 26
 MFS is not alleged to have been, and never was, a trustee of the Fund. In fact, MFS did not become the Fund's investment adviser until March 15, 1997, two days after the independent trustees decided not to renew NMI's contract. Further, according to the Declaration of Trust, a trustee must be a natural person. Similarly, the independent trustees did not appoint Scott as a trustee of the Fund until April 13, 1997, nearly one month after the independent trustees voted not to renew NMI's contract. Additionally, because Scott was an officer and director of MFS, he served as an interested trustee of the Fund. By the plain terms of the ICA, interested persons are prohibited from participating in the vote to retain or replace an investment adviser. See 15 U.S.C.§§ 80a-15(c).
 
 
 27
 The district court properly concluded that neither MFS nor Scott were trustees to the Fund -and therefore did not owe a fiduciary duty to the shareholders -when the independent trustees decided to change investment advisers.
 
 2. De Facto Investment Adviser
 
 28
 Appellants argue that MFS and Scott owed a fiduciary duty because they "were, in substance, acting as Trustee and Investment Adviser prior to March 15, 1997, irrespective of a formal agreement." The contention that MFS and Scott were "de facto" investment advisers has no basis in law and is contrary to the plain language of the ICA.
 
 
 29
 Appellants rely on Lutz v. Boas, 171 A.2d 381 (Del. Ch. 1961). Lutz, however, does not support the argument that a party becomes a trustee or investment adviser to fund shareholders simply by advocating its investment advisory services to the trustees. Rather, Lutz provides that where the agent of an investment advisory company enters into an explicit agreement with and receives compensation from a fund for advisory services, with the knowledge of the investment advisory company, the company cannot avoid ICA regulation by refusing to enter into a formal Investment Advisory Services agreement. Id. at 389-90.
 
 
 30
 Here, appellants failed to allege that MFS or Scott entered into any agreements -even informal ones -or that they received compensation for any purported advisory services. Lutz does not support appellants' theory that MFS and Scott were de facto trustees or investment advisers under the ICA.
 
 
 31
 Appellants also contend that they are helped by the terms "Advisory Board" and "Director" under the ICA, arguing that MFS became an "Advisory Board" and Scott a"Director" because they urged the independent trustees to replace NMI. This argument fails under the plain language of the ICA.
 
 
 32
 The ICA defines "Advisory Board" as an " elected or appointed" board with "advisory functions as to investments." 15 U.S.C. §§ 80a-2(a)(1) (emphasis added)."Director" is defined as "any director of a corporation or any person performing similar functions with respect to any organization." 15 U.S.C. §§ 80a-2(a)(12). Appellants have not alleged that MFS was elected or appointed in any capacity prior to the independent trustees' non-renewal of NMI's contract. Nor have appellants alleged that Scott was performing the functions of a director before the non-renewal of NMI's contract.
 
 
 33
 The district court properly concluded that MFS and Scott were not "de facto" investment advisers owing a fiduciary duty to the shareholders of the Fund.
 
 3. Control
 
 34
 The district court also properly concluded that MFS and Scott cannot be held liable for breach of fiduciary duty under the ICA on the theory that they "controlled" the independent trustees.
 
 
 35
 The ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." 15 U.S.C. §§ 80a-2(a)(9). MFS and Scott could not have been "control persons " under the ICA, however, because the independent trustees do not fall within the definition of "controlled persons" under the ICA. "A natural person shall be presumed not to be a controlled person within the meaning of this subchapter." 15 U.S.C. §§ 80a-2(a)(9). This presumption can only be overcome by "a determination to the contrary made by the Commission." Id. No such determination has been made by the SEC here. MFS and Scott cannot be held liable for breach of fiduciary duty under a theory of control.
 
 
 36
 We hold that the district court properly dismissed appellants' claims against MFS and Scott for breach of fiduciary duty under the ICA.[4]
 
 
 37
 C. Dismissal of Delaware claims against MFS and Scott
 
 
 38
 Appellants also contend that the district court erroneously dismissed its claims against MFS and Scott for breach of fiduciary duty under Delaware common law. The district court addressed two theories in dismissing appellants' claims against MFS and Scott for breach of fiduciary duty under Delaware law.
 
 1. Fiduciary Duty
 
 39
 As discussed above, neither MFS nor Scott owed a fiduciary duty to the Fund when the independent trustees decided not to renew NMI's contract to provide investment advisory services. Appellants cite no authority for the proposition that a third party with no contractual or legal relationship to the Fund can become subject to a fiduciary duty merely because it provided information about its services to the independent trustees. Delaware law is to the contrary. See Gilbert v. El Paso Co. 490 A.2d 1050, 1056 (Del. Ch. 1984) ("State law claims of . . . breach of fiduciary relationship must subsist on the actuality of a specific legal relationship, not in its potential.").
 
 
 40
 The district court properly determined that because neither MFS nor Scott owed a fiduciary duty to the shareholders of the Fund when the independent trustees decided not to renew NMI's contract, neither can be liable for breach of fiduciary duty under Delaware law.
 
 2. Control
 
 41
 The district court also correctly held that neither MFS nor Scott "controlled" the independent trustees under Delaware law. See Harriman v. E.I. DuPont De Nemours & Co., 372 F. Supp. 101, 106 (D. Del. 1974) ("[i]t is only when a person affirmatively undertakes to dictate the destiny of the corporation that he assumes such a fiduciary duty"); Gilbert, 490 A.2d at 1055 (outsiders do not become fiduciaries simply because they have a "superior bargaining position " with management; there must be "domination . . . through actual exercise of direction over corporate conduct").
 
 
 42
 Here, appellants failed to offer -and do not offer on appeal -any facts to establish that MFS and Scott affirmatively dictated the destiny of the Fund or dominated through actual exercise of direction over the independent trustees.
 
 
 43
 We hold that the district court properly dismissed appellants' claims against MFS and Scott for breach of fiduciary duty under Delaware common law.[5]
 
 
 44
 D. Dismissal of waste and interference with prospective economic advantage claims against MFS and Scott
 
 
 45
 Appellants contend that the district court erroneously dismissed Navellier's claims against MFS and Scott for waste and for intentional interference with prospective economic advantage pursuant to Federal Rule of Civil Procedure 12(b)(6). Appellants' arguments are without merit.
 
 1. Waste
 
 46
 The parties agree that Delaware law is controlling on this issue. Delaware courts have explained that the legal test for waste is "severe." Glazer v. Zapata Corp. , 658 A.2d 176, 183 (Del. Ch. 1993). "Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." Id.
 
 
 47
 We hold that the district court properly dismissed the waste claims asserted against MFS and Scott. Under Delaware law, there is no basis for a waste claim against these parties who were not directors. Moreover, appellants' first amended complaint itself established that a shareholder proxy vote was legally required pursuant to Rule 15a-4 of the ICA, which also shows there could have been no waste.
 
 
 48
 2. Interference with prospective economic advantage
 
 
 49
 California recognizes a "competition privilege," which protects one from liability for inducing a third person not to enter into a prospective contractual relation with a business competitor.
 
 
 50
 The privilege applies where (a) the relation [between the competitor and third person] concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other.
 
 
 51
 Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners, 52 Cal. App. 4th. 867, 880 (1997) (internal quotation marks and citations omitted). See also Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 751 (Cal. 1995) (holding that plaintiff who seeks to recover for an alleged interference with prospective economic relations must prove that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."). The competition privilege clearly applies to MFS' and Scotts' actions as alleged in the amended complaint, and nothing about their competitive conduct was wrongful.
 
 
 52
 We hold that the district court properly dismissed the claims against MFS and Scott for intentional interference with a prospective economic advantage.
 
 
 53
 E. Dismissal of counterclaims without prejudice
 
 
 54
 Appellants allege -in one paragraph without citation to the record or authority -that the district court abused its discretion in dismissing appellees' indemnity counterclaims without prejudice. Appellants contend that "[t]he jury should have been informed that those claims had not merely vanished but that Defendants might refile and seek $3.5 million in attorneys fees . . . ."
 
 
 55
 Appellants' argument is frivolous. The decision to grant a voluntary dismissal under Federal Rule of Civil Procedure 41(a)(2) is addressed to the sound discretion of the district court. Sams v. Beech Aircraft Corp., 625 F.2d 273, 277 (9th Cir. 1980). A dismissal without prejudice pursuant to Rule 41(a)(2) leaves the parties where they would have stood had the lawsuit never been brought. In re Corey, 892 F.2d 829, 835 (9th Cir. 1989) (citation omitted).
 
 
 56
 Appellants' bare allegation of error does not demonstrate that the district court abused its discretion in dismissing appellees' indemnity counterclaims without prejudice. See Hamilton v. Firestone Tire & Rubber Co., 679 F.2d 143, 145 (9th Cir. 1982) (possibility of later suit does not rise to the level of legal prejudice that would allow the court to deny a dismissal without prejudice).
 
 
 57
 F. Summary judgment on intentional interference with prospective economic advantage claim
 
 
 58
 Appellants allege that the district court erroneously granted summary judgment on NMI's claim against the independent trustees for intentional interference with prospective economic advantage. The district court correctly held that there were no triable issues of fact as to two essential elements of this claim.
 
 
 59
 We review de novo the district court's order granting summary judgment. Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir. 1997). Viewing the evidence in the light most favorable to appellants, we must determine whether there are genuine issues of material fact and whether the district court properly applied the law. Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997).
 
 
 60
 To state a claim for intentional interference with prospective economic advantage, a plaintiff must prove: (1)"the reasonable probability of a business opportunity," (2) "the intentional interference by defendant with that opportunity," (3) "proximate causation," and (4) "damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch. 1980) (internal citations omitted). See also Crosstalk Prods., Inc., v. Jacobson, 65 Cal. App. 4th 631, 646 (1998) (stating elements of tort of intentional interference with prospective economic advantage under California law).
 
 
 61
 First, appellants failed to present evidence demonstrating a reasonable probability that NMI would continue as the investment adviser to the Fund. Appellants point to no evidence in the record which, when viewed in a light most favorable to their position, demonstrates that NMI had a reasonable expectation of continuing as the Fund's investment adviser. Rather, appellants simply assert that "a Board that was acting with proper motives" would have renewed NMI's contract. This is not, however, evidence of a "reasonable" expectation of a continuing business relationship. The district court properly concluded that NMI did not have a reasonable expectation of continuing as the Fund's investment adviser.[6]
 
 
 62
 Appellants also failed to point to evidence demonstrating damages. As the district court noted, "the claim must still fail because the damages flowing from defendants' interference with this prospective business relationship are too speculative. `It is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery.' " (Quoting Mozzetti v. City of Brisbane, 67 Cal. App. 3d 565, 577 (1977)).
 
 
 63
 Because appellants failed to present evidence demonstrating that NMI had a reasonable expectation of continuing as the Fund's investment adviser and did not establish actual damages, we hold that the district court properly granted summary judgment on NMI's claim for intentional interference with prospective economic advantage.
 
 
 64
 G. Summary judgment on Sletten's counterclaims
 
 
 65
 On cross-appeal, Sletten contends that the district court erroneously granted summary judgment on the breach of contract counterclaims that he asserted against Navellier and NMI. We disagree.
 
 
 66
 Before returning the Fund to Navellier, Sletten and the independent trustees executed the following release:
 
 
 67
 In consideration of the covenants, promises and agreements contained herein, Donald Simon, Kenneth Sletten and Lawrence Bianchi (collectively "Trustees") . . . release and fully discharge Louis Navellier, Navellier Management, Inc., and their predecessors, successors and related entities . . . from all rights, claims and causes of action of any kind or any nature whatsoever, known or unknown, in law or at equity, which the Trustees have or may have against them except for any claim for contribution or indemnity in the event that any third party asserts claims and recovers against the Trustees.
 
 
 68
 Sletten concedes that, if valid and enforceable, this release bars his counterclaims. Sletten contends, however, that there are genuine issues of fact as to whether the release is unenforceable on grounds of unconscionability or duress.
 
 1. Unconscionability
 
 69
 Under California law,[7] a court may refuse to enforce a facially valid contract that is unconscionable. See Graham v. Scissor-Tail, Inc., 623 P.2d 165, 173-74 (Cal. 1981). Unconscionability has both a "procedural" and a"substantive" aspect. The procedural aspect is manifested by (1)"oppression," which refers to an inequality of bargaining power resulting in no meaningful choice for the weaker party, or (2) "surprise," which occurs when the supposedly agreed-upon terms are hidden in a document. A & M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473, 486 (1982). Substantive unconscionability, on the other hand, refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made. Id. at 487; see also Stirlen v. Supercuts, Inc., 51 Cal. App. 4th 1519, 1532 (1997) (substantive unconscionability is indicated by contract terms so one-sided as to "shock the conscience"). Both procedural and substantive unconscionability must be present before a contract or clause will be held unenforceable. Carboni v. Arrospide, 2 Cal. App. 4th 76, 83 (1991).
 
 
 70
 Here, the record indicates that there are no genuine issues of material fact indicating that the challenged release was either procedurally or substantively unconscionable. As the district court noted, Sletten freely chose to waive his legal rights in order to preserve the stability of the Fund, he was well-represented by counsel, and he had adequate time to pursue other alternatives. And, as the district court properly found, the release "is also not unconscionable because it was `one-sided,' nor does it shock the conscience."
 
 2. Duress
 
 71
 A release may be invalidated on the ground of economic duress when a party is subject to a wrongful act such as a threat and must succumb to the wrongdoers or face financial ruin. Sheehan v. Atlanta Int'l Ins. Co., 812 F.2d 465, 469 (9th Cir. 1987). The wrongful act must be " `sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.' " Id. (quoting Rich & Whillock, Inc. v. Ashton Dev., Inc., 157 Cal. App. 3d 1154, 1158 (1984)).
 
 
 72
 There are no genuine issues of material fact indicating that the challenged release was procured though economic duress. Sletten had more than one alternative to signing the release and accepting NMI's return as investment adviser. Sletten might have hired a company named Neuberger and Berman as investment adviser, liquidated the Fund, appointed a receiver, or found another investment adviser. While Sletten may have found these choices unattractive, the district court properly found that "there was no economic duress, as none of these choices would have caused Sletten . . . to face economic ruin."Because there were no material issues of fact as to the validity or enforceability of the release, we hold that the district court properly granted summary judgment on Sletten's counterclaims.
 
 H. Class certification
 
 73
 Appellants contend that the district court abused its discretion by denying class certification pursuant to Federal Rule of Civil Procedure 23(b)(3). We review the denial of class certification for abuse of discretion, Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), and must determine whether the district court applied the proper legal criteria. "While the trial court has broad discretion to certify a class, its discretion must be exercised within the framework of Rule 23." Id.
 
 
 74
 The district court gave five grounds for denying class certification pursuant to Rule 23(b)(3), each of which sustains the denial. The district court held that: (1) individual questions predominate over common questions; (2) intra-class conflicts preclude certification; (3) Kornhauser, as class counsel, "cannot adequately represent the class;" (4) Navellier was neither a typical nor adequate class representative and was subject to unique defenses; and (5) the remaining class members were not appropriate class representatives.
 
 
 75
 Appellants' challenge to the district court's denial of class certification is supported by virtually no citations to authority and no citations to the record. For example, as to three of the district court's independent grounds justifying denial of certification, appellants simply argue: "[T]here are no intra or interclass conflicts, there are no unique defenses as to Mr. Navellier which would preclude him or any of the other Plaintiffs from acting as class representatives." These bald assertions do not establish that the district court abused its discretion in denying class certification.
 
 
 76
 The district court correctly applied Rule 23 and each ground advanced is independently sufficient to support the denial of certification. See, e.g., Valentino v. Carter-Wallace, 97 F.3d 1227, 1230 (9th Cir. 1996) (failure to show predominance of individual questions); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (9th Cir. 1997) (intra-class conflicts); Hatch v. Reliance Ins. Co., 758 F.2d 409, 416 (9th Cir. 1985) (class counsel's inadequacy); Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983) (inadequate class representative).
 
 
 77
 We hold that the district court did not abuse its discretion in denying class certification.
 
 II. Trial Management
 A. Time limitations
 
 78
 Appellants contend that the district court's imposition of a time limit within which to present their case "was prejudicial and deprived them of due process." This argument is without merit.
 
 
 79
 We review such challenges to trial court management for abuse of discretion. Amarel v. Connell, 102 F.3d 1494, 1513 (9th Cir. 1997). Trial courts have broad authority to impose reasonable time limits. Id. Such limits are useful to "prevent undue delay, waste of time, or needless presentation of cumulative evidence." Id. (internal quotation marks and citation omitted). While trial courts have discretion to expedite the completion of trials, "they must not adhere so rigidly to time limits as to sacrifice justice in the name of efficiency." Gen. Signal Corp. v. MCI Telecomm. Corp., 66 F.3d 1500, 1509 (9th Cir. 1995).
 
 
 80
 The district court exercised a normal role in establishing time limits at trial and did not abuse its discretion. At the pre-trial conference, the court informed the parties that they would have eleven days, to be divided between them, for trial. Appellants insisted they needed at least ten to twelve days to present their case.[8] In response, the district court extended the time allotted for trial to fourteen days, giving appellants eight days and appellees six days. These pretrial limits were adjusted during trial and appellants ultimately received a total of eleven days within which to present their case -an amount entirely consistent with appellants' original request.
 
 
 81
 The time limits imposed here were reasonably based on the parties' estimates and were adjusted as appropriate during trial. Amarel, 102 F.3d at 1513. The district court appears to have been fair and balanced in allocating the reasonably available time to all parties. There was no abuse of the broad discretion that the district court had to manage the trial.
 
 B. Evidentiary rulings
 
 82
 Appellants challenge evidentiary rulings made by the district court throughout the trial. We review the district court's evidentiary rulings for abuse of discretion and"will not reverse in such a case, unless the ruling is manifestly erroneous." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997) (internal quotation marks and citation omitted).
 
 
 83
 None of these challenges has merit and none requires our detailed discussion. As to each of the challenged rulings, appellants do not demonstrate that the district court's action was "manifestly erroneous." Id. We hold that the district court did not abuse its discretion in making the challenged evidentiary rulings.
 
 C. Comment on accusations of perjury
 
 84
 Appellants argue that the district court improperly influenced the jury by accusing Navellier of perjury. This argument is without merit.
 
 
 85
 During cross-examination, Navellier claimed that the independent trustees had perjured themselves at trial by testifying to the substance of a conference call between Navellier and the independent trustees. In response to this accusation, the court admonished Navellier: "All right. This is enough. That's a very, very serious charge that he's made under oath, and it could be perjurious. This could be a criminal proceeding." Appellants' counsel objected, and the court then immediately instructed the jury to disregard his prior comment:
 
 
 86
 All right. I think his objection is good, ladies and gentlemen of the jury, and the jury will disregard that statement of the court.
 
 
 87
 And I will, again, admonish you that nothing that the court says or does during the course of this trial should be taken in any way as indicating how your verdict should come out.
 
 
 88
 You, and you alone, are the sole judges of the facts in this case, and it's your judgment that counts on the facts, it's not the court's.
 
 
 89
 Trial courts have broad discretion to comment upon the evidence, including the credibility of a witness. See Quercia v. United States, 289 U.S. 466, 469 (1933) (noting that in a jury trial in federal court, judge may "express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination") (citations omitted). The essential question is whether the court made clear to the jury that all matters of fact are for its determination. Id.; see also United States v. James, 576 F.2d 223, 228 (9th Cir. 1978) (affirming conviction where court commented that the elements of the offense had been established, but also instructed the jury that it was the final arbiter of questions of fact).
 
 
 90
 We hold that the court here did not abuse its discretion by commenting on Navellier's testimony. The court did not distort the evidence and the court's comment was not so one-sided as to amount to an abuse of discretion. See Quercia, 289 U.S. at 469. Further, even if the comment could be considered prejudicial, any prejudice was cured by the court's contemporaneous curative instruction and the final jury instructions, which stressed that the jurors were the sole judge of the facts. Cf. Maheu v. Hughes Tool Co., 569 F.2d 459, 472 (9th Cir. 1978).
 
 D. Imposition of sanctions against Sletten
 
 91
 On cross-appeal, Sletten argues that the district court abused its discretion in affirming the special master's imposition of sanctions against Sletten and his counsel for "abusive and oppressive" discovery requests. Sletten contends that the sanctions violated his right to due process because he and his counsel were not given notice or opportunity to be heard before the special master imposed sanctions. We agree.
 
 
 92
 We review the imposition of sanctions for abuse of discretion. Primus Auto. Fin. Serv. v. Batarse , 115 F.3d 644, 648 (9th Cir. 1997). When a court imposes sanctions sua sponte, the general rule is that it must first issue an order to show cause why sanctions should not be imposed to give the lawyer or party an opportunity to explain his or her conduct. See, e.g., Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc., 834 F.2d 833, 836 (9th Cir. 1987) (district court abused its discretion where "[n]o notice was given of the court's intention to impose sanctions and no opportunity was offered to explain the allegedly improper filings"); Miranda v. S. Pac. Transp. Co., 710 F.2d 516, 523 (9th Cir. 1983) (district court abused its discretion where it "did not provide the attorneys with an opportunity to show cause to the contrary before imposing the sanctions").
 
 
 93
 Here, Sletten and his counsel first received notice of the sanctions when they received a copy of the special master's order imposing sanctions. This order was summarily approved by the district court. The special master abused its discretion by failing to give Sletten and his counsel notice of his intent to impose sanctions before imposing sanctions. Miranda, 710 F.2d at 522-23. The further review by the district court that affirmed the sanctions provided no procedural relief. We therefore vacate the judgment of sanctions and remand to the district court with instructions that it provide an appropriate procedure to afford Sletten and his counsel an opportunity to present a defense and explain why they should not be sanctioned. In so holding, we express no view on the merits whether sanctions may be sustainable after proper notice and opportunity to be heard.
 
 III. Jury Instructions
 
 94
 Appellants contend that two of the instructions given to the jury were erroneous. The standard of review on appeal for an alleged error in jury instructions depends on the nature of the claimed error. Oglesby v. S. Pac. Transp. Co., 6 F.3d 603, 606 (9th Cir. 1993). If jury instructions are challenged as a mis-statement of the law, we review the challenged instructions de novo. Mockler v. Multnomah County, 140 F.3d 808, 812 (9th Cir. 1998). Otherwise, we afford a district court"substantial latitude in tailoring jury instructions, [and ] we review the formulation of those instructions for abuse of discretion." Gilbrook v. City of Westminster, 177 F.3d 839, 860 (9th Cir. 1999).
 
 A. ICA instruction
 
 95
 Appellants argue that the district court "committed prejudicial error" by refusing to instruct the jury that, absent an emergency or unforseen event, section 15 of the ICA requires prior shareholder approval before an investment adviser may be replaced.[9] We disagree with appellants' construction of the ICA and we hold that the district court properly refused to give appellants' requested instruction.
 
 
 96
 Section 15(a) of the ICA makes it unlawful to serve as an investment adviser except under a contract approved by the shareholders. See 15 U.S.C. §§ 80a-15(a). Recognizing that an unavoidable lapse of time may occur between the end of one contract and the date on which a new contract is approved by a majority of shareholders, the SEC promulgated Rule 15a-4, which provides in pertinent part:
 
 
 97
 Notwithstanding section 15(a) of the Act, a person may act as investment adviser for [a fund] pursuant to a written contract which has not been approved by a majority of the outstanding voting securities of such company during the one hundred and twenty day period after the termination of an investment advisory contract by an event (other than an assignment by an investment adviser in connection with which such investment adviser, or a controlling person thereof, directly or indirectly receives money or other benefit) described in paragraphs (3) or (4) of section 15(a) of the Act or by the failure to renew such contract . . . .
 
 
 98
 17 C.F.R. §§ 270.15a-4.[10]Under the plain language of Rule 15a-4, this exemption is not limited to unforeseeable non-renewals or terminations. As amicus curiae, the SEC explains:
 
 
 99
 The availability of [Rule 15a-4] is not conditioned on a finding that either of the first two events -the non-renewal or termination of an advisory contract by the fund -was unforeseeable. Rather, under the rule's plain language, the only conditions are that: the interim contract may not last more than 120 days; it must be approved by the directors, including a majority of the independent directors; and the compensation under the contract may not exceed what would have been paid under the most recent contract that was approved by the shareholders.
 
 
 100
 See §§ 17 C.F.R. 270.15a-4(a) and (b).
 
 
 101
 Appellants argue that appellees' "reliance on Rule 15a-4 as legal grounds for their actions is legally wrong . .. . Rule 15a-4 is an SEC rule and is not necessarily the law if it does not carry out the intent of the statute (§§ 15(a) of the `40 Act)." We disagree with appellants' analysis. As we see it, Rule 15a-4 is fully consistent with Congressional intent, and indeed is reasonably necessary to implement the purposes of the ICA. We see no reason here not to defer to the sensible and informed judgment of the SEC, the agency charged with administering the statute.
 
 
 102
 Section 6(c) of the ICA grants the SEC broad authority to exempt certain actions from the requirements of the ICA. Section 6(c) of the ICA provides:
 
 
 103
 The Commission, by rules and regulations upon its own motion, or by order upon application, may conditionally or unconditionally exempt any person . . . or transaction, or any class or classes of persons .. . or transactions, from any provisions . . . of this subchapter or of any rule or regulation thereunder, if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this title.
 
 
 104
 15 U.S.C. §§ 80a-6(c). The authorization to exempt any person or transaction from the provisions of the ICA when"necessary or appropriate in the public interest and consistent with the protection of investors" reflects the Congressional intent to entrust certain policy decisions to the SEC.
 
 
 105
 In determining the appropriate scope of the exemption embodied by Rule 15a-4, the SEC was required to balance two important investor protections in Section 15(a). On the one hand, the shareholder approval requirement ensures that fund investors have the authority to decide whether a particular investment adviser is retained by the fund. On the other hand, granting the trustees the authority to terminate or not renew an existing contract gives them critical oversight. Deciding how to reconcile these provisions when their policies conflict is precisely the sort of judgment entrusted to the SEC by Congress.
 
 
 106
 Appellants do not demonstrate that the SEC's promulgation of Rule 15a-4 is inconsistent "with the protection of investors or the purposes fairly intended by the policy and provisions" of the ICA. See 15 U.S.C. §§ 80a-6(c). While Rule 15a-4 permits a brief postponement of the shareholders' right to vote on an advisory contract, it includes additional investor safe-guards, such as the requirement that a majority of the independent trustees approve the interim contract and compensation limitations for the interim period.[11]
 
 
 107
 Also, the SEC's reasonable interpretation of a statute that it administers, including its promulgation of rules and regulations interpreting or implementing the statute, is entitled to deference. Chevron USA, Inc. v. NRDC, 467 U.S. 837 (1984). An agency's interpretation of one of its own rules, including an interpretation expressed in an amicus brief, is controlling unless plainly erroneous or inconsistent with the rule. Auer v. Robbins, 519 U.S. 452, 461-63 (1997). Appellants have not demonstrated that the SEC's interpretation of Rule 15a-4 is plainly erroneous or inconsistent with that rule. To the contrary, we view Rule 15a-4 as a sensible and necessary provision that bridges a potential gap or conflict in the ICA.
 
 
 108
 Because appellants' proposed jury instruction is contrary to the plain language of Rule 15a-4, we hold that the district court properly refused to give the proposed instruction.
 
 B. Business judgment rule instruction
 
 109
 Appellants advance two arguments in support of their contention that the district court erroneously instructed the jury on the business judgment rule.[12] First, appellants contend that the duty of care jury instructions imposed a "subjective" rather than an "objective" test for assessing whether the independent trustees acted properly in terminating NMI. Second, appellants maintain that the district court erroneously instructed that, to rebut the presumption of good faith, appellants were required to prove that bad faith "was the sole or primary motivating factor" for the trustees' decision.
 
 
 110
 As to the independent trustees' duty of care, the court instructed:
 
 
 111
 [A] trustee, to fulfill the requisite duty of care under the business judgment rule must,
 
 
 112
 One: Not have an undisclosed personal financial interest in the transaction that is the subject of the trustee's business judgment.
 
 
 113
 Two: Be informed about the subject of the business judgment to the extent that the trustee reasonably believes to be appropriate under the circumstances, and such belief must be rational.
 
 
 114
 And Three: Rationally believe that the trustee's business judgment is in the best interest of the corporation.
 
 
 115
 The Plaintiff, who is challenging the conduct of the trustees of a mutual fund, must prove that the trustees did not exercise the proper business judgment. And, consequently, you must find that defendants fulfilled their duty of care unless plaintiff proves
 
 
 116
 (a) that the defendants have an undisclosed personal financial interest in the transaction that is the subject of their business judgment, or
 
 
 117
 (b) that defendants were not informed about the subject of the business judgment to the extent that they reasonably believed to be appropriate under the circumstances, or
 
 
 118
 (c) that they did not rationally believe that such business judgment was in the best interest of the corporation, or
 
 
 119
 (d) that no business judgment was, in fact, exercised.
 
 
 120
 (Emphasis added to challenged portion of instruction).
 
 
 121
 The duty of care instruction given here properly stated controlling Delaware law. In Brehm v. Eisner, 746 A.2d 244 (Del. 2000), the Delaware Supreme Court addressed the precise language challenged here:
 
 
 122
 Compare the American Law Institute test, which requires that a director must be "informed . . . to the extent the director reasonably believes to be appropriate under the circumstances." Because this test also is based on the objective test of reasonableness, it could be argued that it is essentially synonymous with the Delaware test . . . . In the end, the debate may be mostly semantic.
 
 
 123
 Id. at 259 n.47 (internal citations omitted) (emphasis added). Thus, Delaware courts have rejected appellants' contention that the duty of care instruction given here erroneously created a subjective -rather than objective -test. Even if there are "semantic" differences between Delaware law and the instruction given here, the district court did not err in giving an instruction that "is essentially synonymous with the Delaware test." Id.
 
 
 124
 Appellants next contend that the district court erroneously instructed that they were required to prove that bad faith "was the sole or primary motivating factor" for the independent trustees' decision.
 
 
 125
 The district court's instruction here complied with Delaware law. In In re Anderson, Clayton Shareholders Litigation, 519 A.2d 680, 688 (Del. Ch. 1986), the court held that to overcome the protection afforded directors by the business judgment rule, plaintiffs must point to facts indicating that "the board's action [was] motivated solely or principally for the impermissible purpose of retaining office for personal reasons and not for reasons relating to the corporations's welfare." Id. (citing Bennett v. Propp , 187 A.2d 405 (Del. 1962)) (emphasis added). And in Pogostin v. Rice, 480 A.2d 619, 627 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d at 253, the Delaware Supreme Court stated that:"It is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, i.e., perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct." (Emphasis added.). See also Cheff v. Mathes, 199 A.2d 548, 554 (Del. 1964); Mesa Petroleum, 493 A.2d at 954.
 
 
 126
 We hold that the business judgment rule instructions given by the district court here properly stated controlling Delaware law.
 
 
 127
 C. Federal Rule of Civil Procedure 37(b)(2) sanction
 
 
 128
 Appellants contend that the district court erred when, as a sanction for discovery abuse, it instructed the jury that Navellier had breached his duty to procure liability insurance for the Fund. We review the imposition of discovery sanctions for abuse of discretion. The Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang, 105 F.3d 521, 524 (9th Cir. 1997).
 
 
 129
 "Rule 37(b)(2) contains two standards -one general and one specific -that limit a district court's discretion. First, any sanction must be `just'; second, the sanction must be specifically related to the particular `claim' which was at issue in the order to provide discovery." Ins. Corp. of Ireland, Ltd., v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707 (1982). Sanctions may be warranted under Federal Rule of Civil Procedure 37(b)(2) for failure to obey a discovery order as long as the established issue bears a reasonable relationship to the subject of discovery that was frustrated by sanctionable conduct. Id. at 707-09.
 
 
 130
 Here, the district court found that Kornhauser, as counsel for Navellier and NMI, willfully refused to answer questions at his deposition concerning the circumstances under which insurance was procured for the Fund -even after the special master ordered Kornhauser to answer the questions. This conduct warranted sanction, and we cannot say that the sanction imposed was not commensurate with the offensive conduct. We hold that appellants have failed to demonstrate that the district court abused its discretion in issuing the sanction.
 
 IV. Post-Trial Rulings
 
 131
 A. Motions for judgment as a matter of law and new trial
 
 
 132
 Appellants argue that the district court erroneously denied their motions for judgment as a matter of law and for new trial. This court reviews de novo the denial of a motion for judgment as a matter of law. United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1268 (9th Cir. 1996). A district court's denial of a motion for new trial is reviewed for abuse of discretion. Desrosiers v. Flight Int'l of Florida, Inc., 156 F.3d 952, 957 (9th Cir. 1998).
 
 
 133
 Appellants erroneously contend that the district court denied their motions on the grounds that they were"untimely." But that is not what the court did. The district court denied appellants' self-styled "renewed" motions for judgment as a matter of law and new trial because appellants in fact had failed to make such motions at the close of evidence. There was nothing that could be renewed following the entry of judgment.
 
 
 134
 Federal Rule of Civil Procedure 50(b) provides, in pertinent part:
 
 
 135
 If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -and may alternatively request a new trial or join a motion for a new trial under Rule 59. (Emphasis added.).
 
 
 136
 We have held that "failure to comply with Rule 50(b) precludes a challenge to the sufficiency of the evidence on appeal and that the requirement that the motion be made at the close of all the evidence is to be strictly observed." Patel v. Penman, 103 F.3d 868, 878 (9th Cir. 1996) (internal quotation marks and citations omitted).
 
 
 137
 The district court properly denied the motions for judgment as a matter of law and new trial. See id. at 879.
 
 B. Motion to amend the complaint
 
 138
 Appellants argue that the district court "committed reversible error" in denying their motion to amend the complaint to conform to the evidence.
 
 
 139
 We need not consider this argument because appellants have waived their challenge to this issue on appeal.[13] See Fed. R. App. P. 28(a)(9) (appellants' brief must contain"appellants' contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). See also Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988) (issues raised in the appellate brief, but not supported by argument, are deemed abandoned); United States v. Loya, 807 F.2d 1483, 1486-87 (9th Cir. 1987) (same). Appellants' failure to provide citations to supportive documents in the record on appeal precludes this argument.
 
 CONCLUSION
 
 140
 We will not disturb the jury's verdict and we affirm the judgment of the district court challenged by appellants. We further hold for Kenneth Sletten on the cross appeal that the district court erred in affirming the special master's imposition of sanctions against Sletten and his counsel. We vacate the imposition of sanctions and remand with instructions to afford Sletten and his counsel an opportunity to present a defense and explain why they should not be sanctioned. Appellees are entitled to their costs on appeal.
 
 
 141
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 In July 1995, Drinkwater resigned as an interested trustee and was replaced by Alan Alpers, another employee of Navellier's.
 
 
 [2]
 The ICA provides that boards of directors of investment companies must be composed of "interested" and "non-interested" or "independent" persons. An "interested" person is generally defined as any person having a direct or indirect financial interest in an investment company. 15 U.S.C. §§§§ 80a-2(a)(19), 80a-2(a)(3). No registered investment company shall have a board of directors more than sixty percent of the members of which are persons who are interested persons of such registered company. 15 U.S.C. §§ 80a-10(a).
 
 
 [3]
 We note that Samuel Kornhauser, counsel for Navellier, NMI, and former counsel for the Fund, represented appellants at trial and on this appeal.
 
 
 [4]
 Because of our disposition of this issue, we do not decide the alternate argument advanced by MFS and Scott -namely, whether the ICA provides a private right of action.
 
 
 [5]
 Because we hold that the district court properly dismissed appellants' state law claims, we do not determine whether the ICA preempts these claims.
 
 
 [6]
 Moreover, so long as the independent trustees were exercising a reasonable business judgment, which was decided by the jury, the independent trustees would be entitled to decline to extend the relationship with NMI. For this reason as well, the claim of interference fails.
 
 
 [7]
 The release was executed in California and includes waiver language referring to California Civil Code section 1542. As a result, we look to California law to determine its validity. See Kaufman & Broad-South Bay v. Unisys Corp., 822 F. Supp. 1468, 1473-74 (N.D. Cal. 1993).
 
 
 [8]
 At the pretrial conference, the court acknowledged that appellants originally claimed to need twenty-five days. However, this estimate was made before the court ruled on the cross-motions for summary judgment. The grant of partial summary judgment eliminated NMI's interference claim as well as Sletten's contract-based counterclaims. The dismissal of these claims streamlined the issues and eliminated the need for expert testimony.
 
 
 [9]
 As a preliminary matter, appellees argue that appellants are precluded from raising this issue on appeal. Specifically, appellees contend that "[a]ppellants did not object when the Court declined to give the proposed instruction and did not object when the Court finished instructing the jury and gave the parties another opportunity to object. " We assume, without deciding, that appellants properly preserved this issue for appeal.
 
 
 [10]
 This regulation has since been amended, but we quote the version that governs this case.
 
 
 [11]
 Further, contrary to appellants' claim, the independent trustees do not have unbridled discretion for 120 days. In deciding whether to enter into an interim contract, just as in deciding whether to renew or terminate an existing contract, the independent trustees must satisfy their duties as fiduciaries of the fund. These duties are enforceable under the ICA, and include the obligation to inform themselves of material facts and exercise their judgment for the benefit of the fund. See 15 U.S.C. §§ 80a-15(c).
 
 
 [12]
 The business judgment rule is a presumption that in making a business decision the directors of a corporation "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (internal quotation marks and citation omitted). The presumption, however, attaches only to the decisions of directors who are fully indepen dent and wholly disinterested. When the business judgment rule applies, it insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption. Id. "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985) (internal quotation marks and citation omitted).
 
 
 [13]
 Further, appellants failed to include the district court's denial of this motion in their excerpts of record or supplemental excerpts of record. See Fed. R. App. P. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion.").