LAS VEGAS-TONOPAH-RENO STAGE LINES, INC., APPELLANT, v. GRAY LINE TOURS OF SOUTHERN NEVADA, RESPONDENT.

No. 19305

May 16, 1990                                      792 P.2d 386

*Parnell & Associates,* Las Vegas, for Appellant.

*Beckley, Singleton, DeLanoy, Jemison & List* and *Franny Forsman* and *Daniel F. Polsenberg,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

### INTRODUCTION

Gray Line Tours of Southern Nevada (Gray Line) was awarded judgment after a bench trial against Las Vegas-Tonopah-Reno Stage Lines, Inc. (LTR), a competitor, for LTR's intentionally interfering with the present and prospective business relationship Gray Line had with USA Hosts, a company that sends business to tour operators. LTR claims that the necessary intent to establish the tort of intentional interference with a prospective business relationship was not proven by Gray Line, that there was a

complete lack of evidence to support damages for a second period of loss based on tortious interference and that prejudgment interest beginning when the complaint was served was improperly awarded pursuant to NRS 17.130 because the loss sustained was subsequent to the complaint's service but prior to the entry of judgment.

We conclude that there was sufficient evidence of LTR's intent to interfere with Gray Line's prospective business relationship which amply supported the damages assessed for the initial period of loss by Gray Line, but that there was insufficient evidence to establish the tortious interference that allegedly caused the business loss during a subsequent period of time. Interest on the damage permitted by NRS 17.130 should have begun at the end of the loss period, not from the time the complaint was served.

## STATEMENT OF FACTS

LTR and Gray Line are competing companies that provide bus transportation and sight-seeing tours for tourists. USA Hosts is a firm which places tourists with bus companies for various activities. It has the exclusive right to place guests at the Las Vegas Hilton with bus services.

From 1980 until 1984 Gray Line was the primary sight-seeing carrier for USA Hosts. This was not pursuant to any formal written contract, but rather a verbal understanding that paid USA Hosts a ten percent commission. USA Hosts began in 1982 to look for a replacement for Gray Line but could not find another adequate carrier. This desire to change carriers may have been sparked by some personal animosity between the presidents of USA Hosts and Gray Line, even though the testimony of USA Hosts' president was that Gray Line ran a fine organization. In late 1983, LTR attempted to negotiate a deal with USA Hosts for its sight-seeing business. This fell through because of LTR's financial problems at that time.

In October 1984, LTR and USA Hosts did reach a verbal agreement to shift USA Hosts' sight-seeing business from Gray Line to LTR. This verbal agreement included a promise by LTR to pay USA Hosts more than ten percent in commissions on sight-seeing tours. Nevada Public Service Commission orders prohibit commissions greater than ten percent to brokers for sight-seeing tours. LTR also agreed to pay commissions to USA Hosts on airport charters when LTR did not have a tariff on file permitting it to do this. This is prohibited by NRS 706.766(1) and LTR was aware of these orders and prohibitions.

On January 15, 1985, Gray Line filed a complaint against LTR

alleging tortious interference with a prospective economic advantage. The summons and complaint were served on January 18, 1985. Little discovery or litigation activity took place until a request for a non-jury trial setting was made in late 1987, and the case was set for trial on March 3, 1988.

The Nevada Public Service Commission became aware of the illegal commissions LTR was paying. On September 13, 1985, the Commission ordered LTR to cease and desist from the payment of these commissions and to take action to collect the excess payments which had already been made to USA Hosts.

In October 1985, shortly after the Nevada Public Service Commission order was entered against LTR, USA Hosts switched its sight-seeing business from LTR back to Gray Line. In December 1985, USA Hosts began splitting its tourist business between Gray Line and LTR. USA Hosts' president was vague in stating his reasons for splitting his business between the two companies. He indicated only that he was giving some business to LTR because it agreed to make amends for its failure to honor its past agreements with USA Hosts. There is no other evidence in the record to show what LTR promised to do or did do to make amends or if illegal commissions were again paid by LTR to USA Hosts. In June 1986, USA Hosts stopped splitting its business between the two companies and again gave all of its business to Gray Line.

After a five-day, non-jury trial, the district court found that a prospective business relationship existed between Gray Line and USA Hosts, that LTR had knowledge of this relationship, and that LTR used unlawful means to interfere with this relationship. The court found that Gray Line lost $217,529 because of the diversion of USA Hosts' business by LTR in 1985. The court further found that Gray Line lost $63,961 from January through May 1986, this being during the period when USA Hosts was splitting its business between the two companies. The court then entered judgment in favor of Gray Line and against LTR in the amount of $337,209. LTR and Gray Line both agree that the district court erroneously entered the judgment amount of $337,209 and that the correct figure based upon the judge's findings should be a judgment of $281,490.

In the judgment entered by the district court, Gray Line was awarded costs and prejudgment interest calculated from the time the complaint was served in January 1985 at the rate of 12 percent per annum, for a final judgment of $472,055.87. The court found no malice in LTR's action and declined to award punitive damages. LTR has appealed from the district court's judgment.

## LEGAL DISCUSSION

I. *Wrongful interference with prospective economic advantage.*

In Leavitt v. Leisure Sports, Inc., 103 Nev. 81, 734 P.2d 1221 (1987), we stated the elements of the tort of wrongful interference with prospective economic advantage, as follows:

> We note that this particular tort possesses the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and, (5) actual harm to the plaintiff as a result of the defendant's conduct. Buckaloo v. Johnson, 537 P.2d 865, 872 (Cal. 1975).[1]

*Leavitt,* 103 Nev. at 88, 734 P.2d at 1225. LTR claims that the *Leavitt* case required Gray Line to prove actual malice or intent to harm and that such proof was not produced at trial. Gray Line counters by asserting that the only intent to harm that *Leavitt* requires is a purposeful interference as opposed to an actual intent to harm. The district court concluded that the intent required for this tort is that the defendant be substantially certain that interference with a commercial relationship will occur. We agree.

In *Leavitt,* we merely summarize the elements of this tort, stating that one element was the intent to harm by preventing the relationship and cited the *Buckaloo* case. While the *Buckaloo* case did not contain an analysis of the intent required for this tort, it does appear that the intent in that case was the defendant doing a purposeful act as opposed to mere negligence or inadvertence. This is in accord with the weight of authority of the jurisdictions that have considered this issue. *See* Yaindel v. Ingersoll-Rand Co., 422 A.2d 611, 622 (Pa.Super. 1980) and Reliable Tire Distributors, Inc. v. Kelley Springfield Tire Co., 592 F.Supp. 127, 139 (E.D.Pa. 1984). As stated in the *Yaindel* case, the intent to harm "must be understood as requiring only an intention to interfere with the plaintiff's prospective contractual relation, and not malevolent spite by the defendant." *Yaindel,* 422 A.2d at 622.

---

[1] The cases are not clear as to what constitutes privilege under this tort. For this reason, we favor the Restatement view that where the interference is improper it is not privileged. *See* Restatement (Second) of Torts §§ 766B: 767 comment (b). Improper or illegal interference is crucial to the establishment of this tort. For instance, in the present case, had LTR not violated the PSC regulations by paying excess commissions, it could not be held liable for intentional interference with a prospective commercial relationship.

The majority view is in accord with the Restatement (Second) of Torts § 766B(d) (1979), which states that "[t]he interference with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." We adopt the view expressed by the Restatement (Second) of Torts and the majority of cases that have adopted this portion, and reject LTR's contention that this tort requires a specific intent to harm akin to proof required in a criminal offense.

II. *Damages for the second period of business loss—(December 1985-June 1986).*

After giving its entire business to LTR for a year (October 1984-October 1985) and then directing all of its business to Gray Line for about two months, USA Hosts began splitting its business between the competitors beginning December 1985. This continued until June 1986. Gray Line asserts that it suffered damages during this period because it received less of USA Hosts' business and LTR's actions again caused it.

There is no doubt that promising and paying illegal commissions was improper and was the reason for the switch of USA Hosts' business to LTR in October 1984. However, the evidence is unclear why USA Hosts changed from giving all of its business to Gray Line to an equal division between the competitors beginning December 1985. The president of USA Hosts simply stated that he made this move because LTR agreed to make amends for its past failure. No evidence of improper commissions promised or paid to induce this shift of business was produced.

USA Hosts is free to give its business to whomever it wants. The recipient of that business is liable to the prior business recipient only if the present recipient tortiously interfered with a business relationship. Gray Line has not established any illegal or improper interference with its relationship with USA Hosts in November or December 1985. The earlier promise of illegal commissions supports the loss of business for the initial one year period. However, that evidence does not establish a subsequent improper action once USA Hosts and Gray Line became reunited.

If there is insufficient evidence to support one or more elements of an alleged tortious act, there can be no recovery. *See* Atkin Wright & Miles v. Montana States Tel, 709 P.2d 330, 337 (Utah Sup.Ct. 1985). Because the interference with Gray Line's business relationship by LTR for the period of December 1985

through June 1986 was not established to be improper, damages of $63,961 allegedly suffered during 1986 by Gray Line cannot be sustained.

III.   *Award of prejudgment interest.*

Gray Line established that LTR wrongfully interfered with a prospective economic advantage between October 1984 and October 1985. The district court awarded damages of $217,529 that Gray Line had shown it suffered in 1985. No evidence was produced to show losses during the period of November through December 1984. Because the complaint was served on January 18, 1985, the vast majority of losses in 1985 were sustained subsequent to the service. The district court awarded prejudgment interest on the total amount of the 1985 losses from the time the complaint was served.

This case presents the issue of when interest, as authorized by NRS 17.130, should begin to run on damages that were sustained after the service of the complaint, but prior to the entry of judgment. NRS 17.130 does not give us clear direction in this situation. It mandates that, unless provided otherwise, all judgments shall draw interest at 12 percent per annum from the service of the complaint until satisfied. The application of this directive to damages sustained before the service of the complaint is obvious. Likewise, the admonishment that any dollar amount in a judgment representing future damages shall draw interest only from the entry of judgment is also unambiguous. We have held if it cannot be determined whether an award of damages represents past or future damages, it is not appropriate to award any interest on the judgment. *See* Jacobson v. Manfredi, 100 Nev. 226, 233-34, 679 P.2d 251, 255-56 (1984), and Stickler v. Quilici, 98 Nev. 595, 596, 655 P.2d 527, 528 (1982). However, the statute does not specifically state when interest shall begin on damages suffered after the service of the complaint but prior to the entry of judgment.

We do not believe that the legislature contemplated this problem when it determined that interest should run from the date the complaint was served. Nor do we think that the legislature would want to permit damages to bear interest from the date the complaint was served even though they were actually incurred some time after the service of the complaint. Accordingly, we conclude that interest should begin to accrue from the time damages actually occur if they are sustained after the complaint is served but before judgment, rather than from the date of serving the complaint or from the date of judgment. To carry interest, dam-

ages must be sustained and specifically quantified. Thus, interest should be awarded on damages suffered after serving the complaint but prior to judgment once the time when incurred and the amount of these damages have been proven by a preponderance of the evidence.

In this case, damages of $217,529 were incurred between October 1984 and October 1985. No breakdown was made as to what damages were sustained prior to or after the service of the complaint, nor was any breakdown of these damages made on a month-to-month or smaller periodic basis. Therefore, Gray Line was entitled to interest on this loss from the date the loss ended, November 1, 1985, until satisfied, and not from the service of the complaint in January 1985. If Gray Line had specifically proven its damages in smaller increments, such as month-by-month, it would have been entitled to interest accruing beginning at the end of each month in which the damage was sustained.

## CONCLUSION

We hold that the lower court correctly concluded that LTR was liable to Gray Line for intentionally interfering with the prospective business relationship Gray Line had with USA Hosts for the period of time between October 1984, and October 1985, but that the court erred in finding that LTR was liable for interfering with the business relationship between Gray Line and USA Hosts from December 1985, through May 1986. Finally, we hold that the court erred in awarding Gray Line prejudgment interest from the time it served the complaint on LTR in January of 1985. Gray Line should have been awarded prejudgment interest on its losses from November 1, 1985.

Accordingly, we affirm the district court's award of $217,529 to Gray Line for damages calculated from 1984 until October 1985, reverse the court's award of $63,961 allegedly sustained in 1986, and remand this case for further proceedings consistent with this opinion. Prejudgment interest must be calculated on Gray Line's damages from November 1, 1985, until the damages are satisfied.