**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONWIDE TRANSPORT FINANCE, a
California general partnership,
           *Plaintiff-Appellant,*

                v.

CASS INFORMATION SYSTEMS, INC.,
           *Defendant-Appellee.*

No. 06-15653

D.C. No.
CV-04-00008-BES

OPINION

Appeal from the United States District Court
for the District of Nevada
Brian E. Sandoval, District Judge, Presiding

Argued and Submitted
January 14, 2008—San Francisco, California

Filed April 28, 2008

Before: John T. Noonan, William A. Fletcher, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Noonan

4499

**COUNSEL**

Lauriann Wright, Law Offices of Thomas B. McCullough, Jr., Marina del Rey, California, for the plaintiff-appellant.

Eric M. Trelz, Polsinelli Shalton Welte Suelthaus PC, St. Louis, Missouri, for the defendant-appellee.

**OPINION**

IKUTA, Circuit Judge:

Plaintiff-appellant Nationwide Transport Finance (Nationwide) appeals the district court's judgment following a jury

verdict in favor of defendant-appellee Cass Information Systems, Inc. (Cass) on Nationwide's claims for intentional interference with contractual relationship, intentional interference with prospective economic advantage, breach of implied contract, and account stated. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I

Prior to trial, the parties agreed to the basic facts underlying this dispute:

> Nationwide is a finance company which typically purchases freight invoices from carriers or truckers who assign their payments under those purchased invoices directly to Nationwide, a type of account receivable financing known as factoring.

> Cass is a freight invoice payment service which is typically hired by shippers or manufacturers to handle the processing and payment of their freight invoices.

> A typical transaction in this dispute involves a shipper, usually a manufacturing company, who needs its products transported across the country by a trucking company, the carrier.

> The shipper agrees to pay Cass the funds needed to pay all of the shipper's verified transportation invoices, and Cass, in return, forwards those funds to the carrier or its designated agent to pay the outstanding invoice.

> The carrier, on the other hand, engages Nationwide to finance its invoices for the transportation services rendered to the shipper.

Once the transportation services are complete, the carrier forwards its resulting invoice to Nationwide.

Nationwide sends the invoice to the shipper or, if the shipper uses Cass for its transportation invoice processing, to Cass for payment.

Nationwide dealt continuously with Cass for over 17 years, from 1986 until approximately mid summer 2003.

During the parties' 17-year relationship, Nationwide received prompt, regular payments from Cass on the transportation invoices it purchased from various interstate carriers.

Occasionally, over the parties' 17-year relationship, Cass erroneously sent a payment directly to a carrier when it should have gone to Nationwide.

When Cass erroneously misdirected a payment to a carrier, Cass would make efforts to resolve the situation and ensure that Nationwide got paid.

In 2003, the parties discovered that several assigned invoices had erroneously been paid directly to a carrier called FWC, Inc. During the resolution of the FWC, Inc., situation, Cass asserted its rights under a hold harmless agreement signed by Nationwide in 1986.

Eventually, Nationwide received payment of the $25,000 misdirected to FWC, Inc.

After Cass asserted its rights under the 1986 hold harmless agreement, Nationwide terminated the agreement. Nationwide refused to sign a new hold harmless agreement.

> On June 4th, 2003, Darla Haynes, Cass's former files and documentation supervisor, informed Nationwide that any future invoices which Cass received from Nationwide would not be paid.
>
> Cass continues to refuse to make any payments to Nationwide. Nationwide continues to refuse to execute a hold harmless agreement.

Nationwide filed an action in the United States District Court for the District of Nevada alleging various Nevada state law causes of action against Cass on January 6, 2004. The complaint included causes of action for (1) intentional interference with contractual relationship, and (2) intentional interference with prospective economic advantage,[1] both based on Nationwide's theory that Cass's conduct was at least partially motivated by an intent to get Nationwide's customers to use Cass's expedited payment service, which Nationwide alleges is a competitor.

At trial, Nationwide intended to show that Cass was liable for both interference torts because its actions were "improper," as explained in the Restatement (Second) of Torts. Under the Restatement, both interference torts include the element of the absence of privilege or justification. The Restatement defines this element as a requirement that a defendant's conduct be "improper." *See* Restatement (Second) of Torts § 767 cmt. a (1979) ("In each of these forms there is a requirement that the interference be both intentional and improper."); *see also id.* cmt. b (discussing the ambiguity in whether the "improper" element is treated as a prima facie element of the torts or an affirmative defense).

---

[1]The complaint also included claims for (1) negligent interference with contractual relationship; (2) negligent interference with prospective economic advantage; (3) breach of implied contract; and (4) account stated. Both negligent interference claims were dismissed with prejudice prior to trial.

Over Cass's objection, the district court ultimately adopted Nationwide's Restatement-based jury instructions for the interference torts, and required Nationwide to prove that Cass acted "improperly" or "without justification" for both torts.[2] The Restatement uses a multi-factor test in determining whether a defendant's conduct is "improper."[3] In its effort to

---

[2]With respect to intentional interference with prospective economic advantage, Nevada law requires a plaintiff to prove the absence of privilege or justification by the defendant, among other elements. *Wichinsky v. Mosa*, 847 P.2d 727, 729-730 (Nev. 1993). However, Nevada has not yet held that a plaintiff alleging intentional interference with contractual relationship must also prove the absence of privilege or justification. *See Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989) (setting forth the elements of intentional interference with contractual relationship under Nevada law). Nevertheless, Nationwide argued that this element should be included in the interference with contract tort because it is part of the Restatement approach to contractual interference, and Nevada state courts often follow the Restatement approach to the interference torts. *See, e.g.*, *Las Vegas-Tonopah-Reno Stage Lines v. Gray Line Tours*, 792 P.2d 386, 388 n.1 (Nev. 1990) ("[W]e favor the Restatement view that where the interference is improper it is not privileged." (citing Restatement (Second) of Torts §§ 766B, 767 cmt. b (1979))); *Crockett v. Sahara Realty Corp.*, 591 P.2d 1135, 1136-37 (Nev. 1979) (citing Restatement of Torts § 768 & cmt. e (1939)). On appeal, neither party challenges the district court's decision to adopt Nationwide's proposed jury instruction, which required Nationwide to prove that Cass acted "improperly" or "without justification" for both torts.

[3]Restatement (Second) of Torts § 767 states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a)   the nature of the actor's conduct,

(b)   the actor's motive,

(c)   the interests of the other with which the actor's conduct interferes,

(d)   the interests sought to be advanced by the actor,

(e)   the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f)   the proximity or remoteness of the actor's conduct to the interference and

(g)   the relations between the parties.

establish that Cass's conduct was improper for both interference torts, Nationwide focused on a factor set forth in § 767(a), the "nature of the actor's conduct." The official comment discussing this factor notes that "[c]onduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper." *Id.* cmt. c. Relying on this comment, Nationwide's theory at trial was that Cass's conduct was improper because it violated or was contrary to Uniform Commercial Code (UCC) § 9-406,[4] incorporated without alteration as Nevada Revised Statute § 104.9406.

UCC § 9-406 provides that after receipt of a valid notice of assignment of an invoice, "the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." U.C.C. § 9-406. As the term is used in Article 9 of the Uniform Commercial Code, an "account debtor" is "a person obligated on an account, chattel paper, or general intangible." U.C.C. § 9-102(a)(3). A shipper is an account debtor because it is obligated to make good on its invoice for the amount the shipper owes to the carrier. Under § 9-406(a), once a shipper receives a valid notice that the carrier has assigned the shipper's invoice to a factor, the shipper can discharge its obligation by paying the factor and may not discharge the obligation by paying the carrier. *See* U.C.C. § 9-406(a). The parties do not dispute that by its terms, § 9-406 is applicable only to the account debtor. Nor do the parties dispute that the shippers were the only account debtors in this case.

At trial, Nationwide based its claim that Cass's conduct was contrary to § 9-406 and thus improper on a legal theory that Cass, as an agent of the shippers, stood in the shoes of the shippers and had an unconditional obligation to pay Nation-

---

[4]Nationwide states in its opening brief that Cass's alleged violation of UCC § 9-406 was also essential to Nationwide's claims for breach of implied contract and account stated.

wide once the shippers received a valid notice of assignment. Therefore, Nationwide contended, Cass's knowing refusal to pay Nationwide on its assigned invoices violated § 9-406, and Nationwide's refusal to sign a new hold harmless agreement could not excuse Cass's refusal.

To support this theory, Nationwide intended to introduce the expert report and testimony of Robert Zadek, an expert on the Uniform Commercial Code and related commercial law, who would discuss how these laws related to the facts of this case. Nationwide also intended to put David Carney, Nationwide's credit administrator and co-owner, on the stand to testify regarding how the UCC is applied in the factoring industry.

On June 22, 2005, Cass filed a motion to strike Zadek's report and testimony, arguing that the entire report should be stricken as inadmissible legal opinion, and alternatively, that those portions that specifically discuss the law and its application should be stricken. Relying on Federal Rule of Evidence 702 (establishing the criteria for admissibility of expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue"), the district court struck "only those portions of the report that discuss the law and its application." The court did not excise sections that discussed "industry conditions, standards, and practices," or sections that discussed factoring, so long as those sections did not cite or apply the relevant law.

Cass later filed a similar motion in limine on Rule 702 grounds to limit David Carney's testimony. In granting the motion, the district court precluded Carney from "discussing the law or its application," "referencing the UCC and other law," and "directly applying the UCC and other law to the facts of this case." The district court held that it would allow "testimony regarding corporate norms."

Cass also filed a motion in limine to preclude Nationwide from introducing any evidence that Cass is an "account debt-

or" under § 9-406 of the Uniform Commercial Code. Because the parties did not dispute that Cass was not itself an "account debtor," the district court held that "any evidence that characterizes [Cass] as an account debtor is irrelevant and inadmissible." Also, because it was uncontested that Cass was an agent of the account debtors (the shippers), the district court held that Nationwide "may refer to [Cass] as an agent of the account debtor because it will simplify the description of [Cass's] role in a typical financing transaction." However, the district court rejected Nationwide's legal theory that § 9-406 imposed legal obligations on the payment agent of a shipper. Therefore, the district court strictly limited the extent to which Nationwide could describe Cass's payment obligations:

> [Nationwide] may not refer to [Cass] as standing in the shoes of the account debtor. This is because [Cass] is merely an agent of the account debtor, and, although [Cass] does carry out some duties on behalf of the account debtor, [Cass's] obligations do not parallel those of the account debtor. Thus, any reference to [Cass] as standing in the shoes of the account debtor would create the impression that [Cass] has the same obligations as the account debtor. This impression would mislead the jury and create confusion regarding the true extent of [Cass's] obligations in a typical factoring transaction. *See* Fed. R. Evid. 403.

Because it rejected Nationwide's legal theory, the district court also refused to give four of Nationwide's proposed jury instructions, namely: (1) a definition of "agent" and "principal"; (2) an instruction that "[a]n agent who does an act otherwise a tort is not relieved from liability" because it acted on the principal's behalf; (3) definitions of various terms under the UCC; and (4) an instruction on § 9-406, Nev. Rev. Stat. § 104.9406. The district court held that because § 9-406 did not impose any obligations on Cass as a matter of law, the

instructions regarding agency, the UCC, and § 9-406 were not applicable.

After a six-day trial, a jury returned a verdict in favor of Cass on every claim.

Nationwide timely appealed, challenging the district court's orders excluding Zadek and Carney's testimony, the order precluding any reference to a payment agent "standing in the shoes of an account debtor," and the refusal to give its requested jury instructions on the UCC and agency principles. Nationwide also argues that the district court erred in its formulation of Nationwide's proposed instruction on § 767 of the Restatement.

## II

We first consider whether the district court erred in granting Cass's motion to strike the expert report and testimony of Robert Zadek and Cass's motion in limine to limit David Carney's testimony under Rule 702 of the Federal Rules of Evidence.[5] "The district court's decision to exclude expert testimony is reviewed for an abuse of discretion." *United States v. Alisal Water Corp.*, 431 F.3d 643, 660 (9th Cir. 2005). We also consider the admissibility of Carney's testimony as lay opinion. "The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a clear abuse of discretion." *United States v. Yaz-*

---

[5]Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*zie*, 976 F.2d 1252, 1255 (9th Cir. 1992) (internal quotation marks omitted).

A

Nationwide challenges the district court's exclusion of portions of Zadek's report and testimony.

**[1]** As a general rule, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal citations and quotation marks omitted); *see also* Fed. R. Evid. 702 (requiring that expert opinion evidence "assist the trier of fact to understand the evidence or to determine a fact in issue").

**[2]** Zadek's original report contained numerous legal conclusions, most of which pertained to Nationwide's theory that Cass was obligated to follow § 9-406. For example, the report stated:

> In acting as a Consignor's [shipper's] agent, Cass has no greater rights than the Consignor would have, except as may be modified by contract between Cass and Nationwide.
>
> . . . [A] primary duty of the Consignor, as the Account Debtor, and therefore of Cass as the agent of the Consignor, is to pay Nationwide, as assignee of the Accounts in which it has a security interest, and concerning which it has received a Notification. Neither the Cass-Consignor, nor Cass, may condition

that payment obligation upon Nationwide entering into any other agreement. . . .

Once a Cass-Consignor has received a Notification from Nationwide, its duties, and that of Cass, as its agent, are clear. It, and Cass, must pay Nationwide.

The report repeatedly described Cass's conduct as "wrongful."

With respect to Zadek's report and testimony, the district court excluded the following legal explanations and conclusions:

(1) sections that discuss the UCC and/or apply the UCC to the facts of this case; (2) sections that discuss non-UCC law and/or apply non-UCC law to the facts of this case; (3) sections that discuss agency law and/or apply agency law to the facts of this case; (4) sections that discuss the parties' legal rights, duties, and obligations under the law; (5) sections that label the parties' actions as 'wrongful' or 'intentional' under the law; and (6) sections that discuss the appropriate formula to calculate damages under the law.

However, the district court allowed Zadek to "discuss industry conditions, standards, and practices," as well as "factual corporate norms."

**[3]** Nationwide argues that excluding this testimony "crippled Nationwide's ability to prove its case." However, under Rule 702, as interpreted by our cases, the district court did not err in excluding Zadek's legal conclusions, even if Zadek's statement of the law had been correct. "Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." *United States v. Weitzenhoff*, 35 F.3d 1275, 1287

(9th Cir. 1993) (internal quotation marks omitted)); *see also United States v. Brodie*, 858 F.2d 492, 496-97 (9th Cir. 1988), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1033 (9th Cir. 1997) (en banc). Nationwide cites a number of cases from this court and other circuits where an appellate court has affirmed the district court's decisions to allow experts to refer to terminology from applicable law in expressing their opinions. *See Hangarter*, 373 F.3d at 1017 ("[A] witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."); *Peckham v. Cont'l Cas. Co.*, 895 F.2d 830, 837 (1st Cir. 1990); *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981). Although Nationwide is correct in noting that a district court does not abuse its discretion in allowing experts to use legal terminology, this does not prove Nationwide's argument, i.e., that a district court per se abuses its discretion when it *excludes* testimony instructing the jury on legal issues. *See Hangarter*, 373 F.3d at 1017 n.13 (rejecting a similar argument). Moreover, as explained below, Zadek's legal conclusions not only invaded the province of the trial judge, but constituted erroneous statements of law. In such a case, "[e]xpert testimony . . . would have been not only superfluous but mischievous." *Brodie*, 858 F.2d at 497. Accordingly, the district court did not abuse its discretion in its ruling on Zadek's testimony and report.

### B

We next turn to Nationwide's challenge to the district court's order precluding Carney "from directly applying the UCC and other law to the facts of this case." Nationwide argues that Carney "was improperly prohibited from discussing or mentioning the UCC." Nationwide offered Carney's legal opinions on the UCC and their applicability to Cass's actions "as specialized knowledge of the business of factoring that will be very valuable to the jury, to determine a fact in issue." According to Nationwide, this "ultimate fact in issue"

was whether Cass acted improperly, and "CARNEY's discussion of the UCC [would be] provided to illuminate the normal relationships and transactions of the factoring business, as governed by the UCC." Nationwide claims it also offered Carney's legal opinions on the UCC not as legal conclusions, but to show Carney's state of mind and reasoning when he rescinded the hold harmless agreement. According to Nationwide, "[t]he fact that Carney rescinded the [hold harmless agreement] because he believed it violated applicable commercial law would have shown to the jury that Carney's rescission was a reasonable business decision to make under the circumstances."

We reject this argument. Whether we consider Carney's testimony as expert or lay opinion testimony, the district court did not abuse its discretion in excluding Carney's legal conclusions. If Nationwide offered Carney's testimony on the UCC's applicability to Cass's conduct as expert testimony, the district court could exclude it for the reasons discussed above. *See supra*, at 4513 (affirming the district court's exclusion of Zadek's report and testimony); *see also Weitzenhoff*, 35 F.3d at 1287. If Nationwide offered Carney's testimony as lay opinion, the district court could exclude it because the testimony was not "helpful to a clear understanding of the testimony or a fact in issue." *Fireman's Fund Ins. Cos. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1468 (9th Cir. 1997) (citing Fed. R. Evid. 701). Carney intended to testify how UCC § 9-406 applied to the facts of the case and explain that Cass's conduct violated UCC § 9-406. Such testimony would, in effect, instruct the jury regarding how it should decide the key question whether Cass violated a statute and thus acted improperly for purposes of the interference torts.

**[4]** In general, "[t]estimony that simply tells the jury how to decide is not considered 'helpful' as lay opinion." *Fireman's Fund Ins. Cos.*, 106 F.3d at 1468 n.3 (citing Fed. R. Evid. 701); *see also Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1988) ("Under either [Rule

701 or Rule 702], evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible."). Although a district court does not abuse its discretion in allowing lay opinion testimony "when a witness cannot explain through factual testimony the combination of circumstances that led him to formulate that opinion," *Fireman's Fund Ins. Cos.*, 106 F.3d at 1468, here the court allowed Carney to provide testimony regarding why he believed Cass acted improperly and why he believed it was reasonable to rescind the hold harmless agreement. The district court precluded Carney only from framing his testimony as a legal opinion that Cass violated the UCC. Because Carney's legal conclusions would have served "to do nothing more than tell the jury what result it should reach," *Kostelecky*, 837 F.2d at 830, and because Carney was able to testify regarding the circumstances that led him to formulate his opinion, *see Fireman's Fund Ins. Cos.*, 106 F.3d at 1468, the district court did not err in excluding Carney's testimony.

**[5]** Accordingly, we hold that the district court did not abuse its discretion in granting Cass's motion to limit David Carney's testimony.

### III

We next consider Nationwide's argument that the district court abused its discretion in excluding its introduction of testimony or other evidence that Cass stood in the shoes of the account debtor for purposes of UCC § 9-406. The district court excluded this evidence on the ground that § 9-406 did not impose legal obligations on Cass and was not relevant to proving that Cass had engaged in improper conduct, a necessary element of Nationwide's claims. Because a district court does not abuse its discretion by excluding evidence that may confuse or mislead the jury, *United States v. Lillard*, 354 F.3d 850, 854-55 (9th Cir. 2003), a district court may exclude evidence relating to erroneous or inapplicable legal theories. *See Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447

F.3d 769, 782-83 (9th Cir. 2006). Therefore, we first consider de novo whether the district court's legal analysis was correct. *See, e.g.*, *Fireman's Fund Ins. Cos.*, 106 F.3d at 1471.

A

Nationwide argues that § 9-406 is applicable to Cass under general principles of agency law, and also as a matter of industry conditions, standards, and practices. We address both arguments in turn.

**[6]** We first note that nothing in the plain language of UCC § 9-406, Nev. Rev. Stat. § 104.9406, nor any judicial decision interpreting that section of which we are aware, supports Nationwide's theory that a payment agent of the account debtor has the same obligations to make payments as the account debtor. By contrast, other provisions of the UCC, as adopted by Nevada, do reference the role of agents.[6] Moreover, the UCC expressly imposes the duties of a principal on the agent in at least one section. Article 8, which requires issuers of securities to register transfers of those securities, *see* U.C.C. § 8-401, imposes the same duty on agents of the

---

[6]*See* Nev. Rev. Stat. §§ 104.1201(2)(gg) (" 'Representative' means a person empowered to act for another, including an agent . . . ."); 104.2201(1) ("[A] contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing . . . signed by the party against whom enforcement is sought or by his authorized agent or broker."); 104.2707(1) ("A 'person in the position of a seller' includes as against a principal an agent who has paid or become responsible for the price of goods on behalf of his principal or anyone who otherwise holds a security interest or other right in goods similar to that of a seller."); 104.3307(1)(a) (" 'Fiduciary' means an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument."); 104.3311(4) ("A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim.").

issuers, i.e., any "person acting as authenticating trustee, transfer agent, registrar, or other agent for an issuer." U.C.C. § 8-407. The absence of any reference to the role of an agent in § 9-406, when the drafters of the UCC expressly delineated the role of agents in other sections, supports Cass's argument that the UCC drafters did not intend to extend the duties of the account debtor to the account debtor's agents. *Coast Hotels & Casinos, Inc. v. Nev. State Labor Comm'n*, 34 P.3d 546, 550 (Nev. 2001) ("[W]hen the legislature has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded.").

Although nothing in § 9-406 imposes the account debtor's obligations on its agents, Nationwide claims that Cass is subject to the obligations of § 9-406 under general principles of agency law. First, Nationwide relies on the general rule that "[a]n agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment." Restatement (Third) of Agency § 7.01. One of Nationwide's proposed (and rejected) jury instructions articulated this same principle: "An agent who does an act otherwise a tort is not relieved from liability by the fact that it acted at the command of the principal or on account of the principal . . . ."

**[7]** This principle of agency law does not prove Nationwide's point, however. Although the Restatement indicates that an agent can be held liable for its own torts where the agent's conduct is independently wrongful, improper, or tortious, this principle would help Nationwide only if Nationwide can show that Cass's conduct was wrongful. If Cass conducted itself improperly, then Cass could not defend itself on the ground that it was acting within the scope of its employment as a payment agent. However, the wrongfulness of Cass's conduct is the very issue that Nationwide is trying to establish. Because Nationwide has not shown that Cass

engaged in wrongful conduct, it is irrelevant that Cass would be independently liable if it had done so. The Restatement (Third) of Agency does not set forth the rule that a principal's duties are imputed to its agent, such that an agent can be held liable if its acts violate a statute that only a principal is obligated to follow. Because the Restatement (Third) of Agency does not set forth such a rule, it does not help Nationwide establish Cass's responsibility under § 9-406 as a matter of agency law. Nor have we identified any other support for the principle that "an agent for paying the debt of its principal is bound to pay it if the principal is bound to pay it." Dissent at 4532.

**[8]** Second, Nationwide relies on the general principle of agency law that a principal may be bound by the actions of its agent towards a third party, and the agent's scope of authority for binding the principal will "depend largely upon the circumstances in each case, and upon what is necessary or reasonable to enable him to effect the purpose of his agency." *Robertson v. C.O.D. Garage Co.*, 199 P. 356, 358 (Nev. 1921). This principle of agency law is also unhelpful to Nationwide, because Cass is the agent, rather than the principal. The shippers may be bound by Cass's actions when Cass acts within its scope of authority as the shippers' agent. However, *Robertson* does not hold that Cass is bound by the shippers' actions, or that because Cass has authority as the shippers' agent, Cass has the statutory obligations of the shippers.

**[9]** Because both of the agency principles identified by Nationwide are inapplicable in the context of this case, we reject Nationwide's argument that § 9-406 is applicable to Cass under general principles of agency law.

In addition to arguing that principles of agency law oblige Cass to comply with § 9-406, Nationwide argues that Cass's failure to comply with § 9-406 violated industry conditions, standards, and practices. According to Nationwide, Article 9

establishes "the rules of the game for secured transactions," and "[t]he conduct of carriers and their factors as well as shippers and their payment agents should all be held to the rules of the game." Nationwide contends that Cass's insistence on obtaining a hold harmless agreement as a condition of paying its factors was improper conduct because it violates "the rules of the game."[7]

[10] Nationwide cites no legal authority for the principle that Article 9 imposes binding obligations on all participants in secured transactions, regardless of the actual terms of a particular UCC section. Nor did Nationwide introduce any evidence supporting its theory that industry conditions, standards, and practices preclude payment agents from requiring a hold harmless agreement as a precondition for making payments on behalf of their clients. Nationwide's expert, Robert Zadek, failed to discuss hold harmless agreements in his expert report, and therefore the district court did not abuse its discretion in precluding him from testifying on this issue. *See* Fed. R. Civ. P. 26(a)(2)(B). Carney testified that his "understanding of this business" was that payment agents were obligated to pay factors (as opposed to carriers) after receiving a valid notice of assignment, but he did not testify that a payment agent would violate industry conditions, standards, and practices if it required a hold harmless agreement in doing so. While Carney testified that he had never been asked by any payment agent other than Cass to sign a hold harmless agreement, he conceded that he was aware of many other factors having hold harmless agreements with Cass. Moreover, one of Cass's witnesses offered uncontradicted testimony that up until the time she left Cass in 2004, no factor other than Nationwide had rescinded Cass's hold harmless agreement. In

---

[7]Nationwide does not argue that Cass's conduct breached any contractual obligation with its shipper clients by requiring a hold harmless agreement. Nor could it, because Nationwide failed to introduce any evidence that Cass's agreements with its shippers required Cass to assume the shippers' unconditional payment obligations under UCC § 9-406.

the absence of any substantial evidence that a payment agent would violate industry conditions, standards, and practices if it required hold harmless agreements, this basis for proving that Cass's conduct was improper also fails.

**[11]** In sum, Nationwide has not identified any legal authority extending the obligations of § 9-406 to the agent of an account debtor.[8] Nationwide offered no evidence that industry customs, standards, or practices precluded a payment agent from requiring a hold harmless agreement. Accordingly, we agree with the district court that Nationwide failed to establish that Cass engaged in improper conduct by requiring factors to enter into a hold harmless agreement as a condition of payment.

The dissent argues that this conclusion will allow shippers to evade their legal responsibilities to pay the debts they owe the factors. Dissent at 4529. This contention misconstrues the nature of the commercial relationships between the parties to this transaction. As noted by the dissent, after receiving a valid notice of assignment from a factor, the shipper can discharge its obligation on the underlying debt only by paying the factor. *See* U.C.C. § 9-406. The factor's remedy, should it fail to get such payment, is to bring a legal action against the shipper on this obligation.[9] Nationwide has also pursued this pathway to recovery, and sued a shipper in state court for the same errant payments at issue in its account stated claim against Cass. If the payment agent's failure to pay the factor violated the payment agent's contract with the shipper, the shipper could bring a legal action against the payment agent

---

[8]We further note that because Nationwide's legal theory was erroneous, any error by the district court in excluding testimony by Zadek and Carney regarding Cass's obligations under UCC § 9-406 was harmless. *Hangarter*, 373 F.3d at 1015.

[9]If the shipper erroneously paid the carrier instead of the factor, the factor could also seek recovery from the carrier to whom the errant payment was made.

for breach of contract. Even though § 9-406 does not itself impose any obligations on a payment agent, neither the factor nor shipper is without recourse if a payment agent fails in its duties.

B

**[12]** Because there is no basis for Nationwide's theory that Cass acted improperly by failing to comply with § 9-406, the district court did not abuse its discretion in excluding evidence that Cass stood in the shoes of the account debtor. As we have previously noted, a party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury, even if the evidence might have been relevant in some conceivable manner. *See Wall Data*, 447 F.3d at 782-83. "[E]ven relevant evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' " *Lillard*, 354 F.3d at 854-55 (quoting Fed. R. Evid. 403). We agree with the district court's conclusion that the probative value of any reference to the erroneous legal principle that Cass stands in the shoes of the account debtor was substantially outweighed by the risk of misleading or confusing the jury on the extent of Cass's obligations as an agent of the account debtor. Fed. R. Evid. 403.

C

**[13]** Nor did the district court err in refusing to give Nationwide's proposed jury instructions on agency and § 9-406. *See Wall Data*, 447 F.3d at 786; *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1022 (9th Cir. 2002) (holding that plaintiff's proposed jury instructions "based in part on federal regulations" were properly omitted because "the proposed instructions overall misstate the law"). While Nationwide's proposed jury instructions on agency and the UCC may have been correct statements of the law, they related to Nationwide's erroneous theory that Cass had legal obligations under

§ 9-406. The district court correctly held that because Nation-wide's legal theory was erroneous, the proposed jury instructions were irrelevant. *Bird*, 303 F.3d at 1022; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("A party is entitled to an instruction about his or her theory of the case if it is supported by law . . . .").

IV

**[14]** Finally, Nationwide argues that the district court made two mistakes in its formulation of Nationwide's proposed instruction based on Restatement (Second) of Torts § 767.[10] First, the district court directed the jury to consider "[t]he nature of the Defendant's conduct," in determining whether Cass's conduct is "justified, privileged or excused." Nationwide argues the district court should have adopted Nationwide's proposed instructions, and directed the jury to consider "[t]he nature of the defendant's conduct, *including whether the defendant's conduct violated any statutory provision*." (emphasis added). The district court did not err in excluding this additional language because it was not supported by the record. The district court had correctly precluded Nationwide from arguing that Cass's conduct violated § 9-406, and Nationwide did not present any evidence that Cass's conduct violated any other statutory provision. A party is not entitled to an instruction unsupported by the record. *Jones*, 297 F.3d

---

[10]In relevant part, the court instructed the jury as follows:

If you have found from the facts that the Defendant did interfere with a prospective economic advantage of Plaintiff, you may consider the following factors to determine whether such interference is justified, privileged or excused: (a) The nature of the Defendant's conduct; (b) The Defendant's motive; (c) The interests of the Plaintiff with which the Defendant's conduct interfered; (d) The interests sought to be advanced by the Defendant; (e) The social interests in protecting the freedom of action of the Defendant and the contractual interests of the Plaintiff; (f) The proximity or remoteness of the Defendant's conduct to the interference; and (g) The relations between the parties.

at 934 ("A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence.").

Second, Nationwide argues the district court erred in instructing the jury on how to determine whether Cass's conduct was improper under § 767. The district court had previously accepted Nationwide's proposed jury instruction, which explained that improper conduct was an element of both the interference with prospective economic advantage tort and the interference with contractual relationship tort. However, the district court left out the reference to the contractual interference tort, apparently inadvertently, when it actually instructed the jury. Specifically, the district court explained to the jury: "[i]f you have found from the facts that the Defendant did *interfere with a prospective economic advantage* of Plaintiff, you may consider the following factors to determine whether such interference is justified, privileged or excused . . . ." (emphasis added).

**[15]** Because none of the district court's remaining jury instructions explained what might constitute improper conduct for purposes of the contractual interference tort, we agree with Nationwide that the district court erred in this § 767 instruction. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984) ("The question . . . is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues."). Nevertheless, this error in the formulation of the § 767 instruction was harmless. Nationwide based its theory that Cass acted improperly on an erroneous interpretation of § 9-406, and therefore the district court correctly precluded Nationwide from introducing evidence supporting this theory. The record establishes that Nationwide did not introduce material evidence of other improper conduct on Cass's part. Because there was little or no evidence establishing a necessary element of Nationwide's interference claims, the district

court's instructional error was harmless. Even if the district court had used Nationwide's proposed formulation it is more probable than not that the jury would have reached the same result. *See Wall Data*, 447 F.3d at 786; *Swinton v. Potomac Corp.*, 270 F.3d 794, 805-06 (9th Cir. 2001).

V

We hold that the district court did not err in restricting Zadek's report and testimony, and Carney's testimony, on the basis that each constituted impermissible legal opinion evidence. We also hold that Cass, as an agent of an account debtor, does not have the same obligations as an account debtor under § 9-406 of the UCC or principles of agency law. Nationwide failed to establish that industry conditions, standards, and practices required Cass to comply with § 9-406. Accordingly, the district court did not err in any of its evidentiary rulings. Because UCC § 9-406 was inapplicable, the district court did not err in refusing to give jury instructions on § 9-406 and agency. Nationwide's proposed revision to the district court's Restatement § 767 instruction was unsupported by the record, and any remaining error in the district court's formulation of the Restatement § 767 instruction was harmless.

**AFFIRMED.**

---

NOONAN, Circuit Judge, dissenting as to Part III:

This case involves the interaction of common law principles of agency and tort with the Uniform Commercial Code. It is of uncommon interest in its potential impact on credit in the large area in which factors furnish credit. Because the case may be seen as merely "a commercial dispute" to be decided under state law, its broader significance needs to be addressed.

This case consists in a paying agent's refusal to pay its principal's creditor unless the agent obtained a benefit from the creditor that the agent was supposed to pay. To understand the case the jury needed to know that the principal had an absolute obligation to make the payment under U.C.C. § 9-406; that its agent had undertaken to make the payment; and that to advance its own interest the agent held up payment. The majority says that there is no principle of agency that required the paying agent to pay. The principle is that an agent to make a payment is bound by its acceptance of the agency. If the obligation of the principal to pay is absolute under an applicable statute, as it was here, the agent has an absolute duty to make the payment. For the agent to hold up payment in order to obtain a benefit for itself is improper and, when it results in injury to the payee, is an actionable interference with a business relationship between the payee and its clients.

The economy of the United States runs on credit. A critical section of the vast area is occupied by factoring — in this instance, the advance of cash to clients that are undercapitalized and not candidates for bank loans and possessed of few assets save their accounts receivable, which they assign the factors in return for their cash. Probably at least 2,500 factors do business in the United States. Factored sales in 2006 totaled more than $127.6 billion. Tina Szejkowski, *Asset-Based Lending Continues its Evolution as Mainstream Borrowing Option*, Commercial Finance Association, (July 23, 2007), *available at* http://www.cfa.com/Statistics/statistics_news_release.asp. New law affecting such an industry is not to be lightly made or buried in a memorandum disposition. The present case requires an understanding in the case of the role of the Uniform Commercial Code, incorporated into the Nevada law that governs here by Nevada Revised Statute § 104.9406.

Nationwide is a factor, advancing cash to carriers, typically small trucking companies, in exchange for their assignment of

the freight invoices sent by the carriers to shippers. The shippers are obligated on these invoices and are, therefore, under U.C.C. § 9-406 "account debtors." Shippers, however, typically do not pay the invoices directly but hire Cass as a paying agent to process and pay them. Cass processes and pays over 100,000 freight invoices per day, more than 25,000,000 per year. In relative strength, Cass is a Goliath, Nationwide a comparative David. For seventeen years these two middlemen enjoyed a profitable relationship.

In 2003, a dispute broke out between them as to Cass's payment of one invoice. Cass drew attention to a hold-harmless agreement by which Nationwide absolved Cass from errors in payment. A new administrator of credit at Nationwide cancelled the agreement. Cass refused to do business without it. A substantial number of shippers used Cass as their paying agent. When Cass would not act for them in paying invoices assigned to Nationwide, Nationwide was impacted. In the words of Nationwide's expert, "The effect on Nationwide was profound."

Nationwide had also discovered that Cass appeared to compete with it in a program it called Cass Expedite. The program is described by Nationwide's expert:

> The Expedite Service Agreement (entered into between a Carrier and Cass) relates to Accounts created by the carriage of freight by Carriers for Cass-Consignors. The Accounts would have whatever payment terms are agreed to between the Carrier and the Cass-Consignor (thirty days, for example). In consideration of the payment of a fee by the Carrier to Cass, Cass agrees to accelerate payment of the Account to two business days following its processing of it. The effect on the Carrier is clear:

> 1. Its liquidity is improved, since it does not have to wait thirty days for payment.

2. It pays a fee for this "prepayment," which is the functional equivalent of the fees which it would have to pay to a factor.

It is clear that, insofar as a Carrier is concerned, this is an alternative to factoring, at least to the extent that a Carrier is serving Cass-Consignors. Such a Carrier would enjoy the benefits of prompt payment of Accounts owning by Cass-Consignors (albeit upon payment of a fee to Cass) and would not need factoring services. Thus, through its Expedite program, Cass is now a competitor of Nationwide. Notably, the marketing material used by Cass to promote its Expedite program makes direct comparisons to traditional factoring. Both Cass, through its Expedite program, and Nationwide are seeking business from the same customer base — Carriers.

The accuracy of this analysis of Cass's position was disputed. But believing that Cass had improperly refused to accept the invoices held by Nationwide and that Cass was attempting in this way to squash a small competitor, Nationwide brought this suit.

## ANALYSIS

*The standard of review*. Cass argues that the standard is abuse of discretion, Nationwide that it is de novo. Nationwide has the better of the argument as to our review of the instructions given the jury. The issues as to the instructions were issues of law, not fact. Review is de novo. *Navellier v. Sletten*, 262 F.3d 923, 944 (9th Cir. 2001).

*What is not an issue*. Both sides agree that Cass is not an account debtor as defined by the U.C.C.

*What is at issue*. (a) *Agency*. Cass denies that there was proof that it was a paying agent for the account debtors. Cass

made this denial in argument to the trial court and again in oral argument to us. The argument is succinctly put in its brief on this appeal:

> Nationwide presented no evidence showing that Cass was the agent of the account debtor or that Cass somehow "stands in the shoes of the account debtor." Nationwide failed to prove that any such agency relationship existed or that Cass agreed to "stand in the shoes of the account debtor" so that Cass was required to pay Nationwide's factored invoices.

Nationwide argues to the contrary. Cass's self-description is that it is a payment service. It is as a payment service that it describes itself in the hold-harmless agreement. In the course of the trial Cass agreed that it was the agent for payments by shippers. The trial court concluded:

> The parties agree that Defendant was the account debtor's agent. Accordingly, this Court finds that Plaintiff may refer to Defendant as an agent of the account debtor because it will simplify the description of Defendant's role in a typical factoring transaction.

The court instructed the jury that the following facts have been "admitted by the parties and require no proof:"

> Cass is a freight invoice payment service which is typically hired by shippers or manufacturers to handle the processing and payment of their freight invoices.

> The shipper agrees to pay Cass the funds needed to pay all of the shipper's verified transportation invoices, and Cass, in return, forwards those funds to the carrier or its designated agent to pay the outstanding invoices.

It may be said that the contract of agency was not in evidence and that we do not know every term of it. But we do know that Cass was not an agent to receive goods, ship goods, or collect damages for the shipper. As Cass described itself, it provided "payment service." It provided such service to account debtors that had a statutory duty to pay for goods they received. To pretend that the nature of the agency was unknown is to engage in fantasy. The reason the account debtor made Cass its agent was to discharge its obligation to pay. Cass accepted that obligation as its business.

That Cass should, on this appeal, argue that it was not an agent underscores the weakness of its case.

(b) *The place of the U.C.C.* According to Cass, the U.C.C. is "simply irrelevant." Once it is agreed that Cass is not an account debtor, Cass claims that the U.C.C. disappears from the case. Again, the argument points to the weakness of Cass's position.

Nationwide's case is comprehensible only if the U.C.C. is understood as relevant. The U.C.C. imposed on the shippers as account debtors an absolute duty to pay the freight invoices of which Nationwide was the assignee. The shippers could not duck the duty by an arrangement for payment that left their paying agent with discretion to pay or not. Accepting agency to pay, Cass accepted the obligation of the account debtors to pay.

The logic and force of Nationwide's argument are compelling. It is not suing in contract but in tort against an agent which improperly refused to fulfill an obligation it had undertaken and thereby interfered with Nationwide's relationships with its clients.

*The rulings of the district court.* Despite instructing that Cass was "a freight invoice payment service," the district

court refused Nationwide's requested instructions on the law of agency:

> Ms. Wright (Counsel for Nationwide): First of all, we had proposed some basic agency instructions that have not been included, specifically number ten, which defines what an agent is, and I would state that there has definitely been evidence in this trial that Cass was acting as an agent.
>
> And most importantly is our instruction number 12 which makes it clear that an agent is liable in tort just as much as the principal, and I think that's important because they're probably going to argue it in closing, we're just an agent.
>
> So I think it's key and important, and there's definitely evidence as well as inferences at this trial to support such an instruction.
>
> The Court: Counsel?
>
> Mr. Trelz: Your Honor, there has been no evidence whatsoever of our agency relationship with a shipper client. There has been no proof of the course and scope of that agency relationship. In fact, [Nationwide's administrator] testified that he had no knowledge of the terms of the agreements between Cass and its shipper.
>
> To have an agency instruction under those circumstances, I think, is just absolutely wrong.
>
> There have been references in the hold harmless agreement that we're a payment agent. That doesn't specify the course and scope of our agency relationship.

What are the terms? Under what — under what circumstances are we required to pay? That evidence is not in this case, and that instruction was properly excluded from this case.

The Court: Thank you. Your objection is noted, then, Ms. Wright.

Next objection?

. . .

Ms. Wright: The next one, of course, is about the UCC, our last one.

We had proposed instructions 23 and 24. The reason we had done that is, as you know, your Honor, defense had filed several motions in limine that were granted that no one could talk about the UCC in this trial, and we abided by that because we knew we could get a jury instruction in, and how that specifically relates is to your instruction [on the Restatement (Second) of Torts § 767] that we already have.

Subpart A of that instruction talks about the nature of the defendant's conduct, and this goes to justification defense, or sometimes considered the improper prima facie element.

And the cases that I cited in our sources for this instruction specifically talked about when a defendant violates a statutory provision, that is evidence of improper nature of the conduct.

So it's important to us that we somehow show to the jury how the UCC would apply to this situation.

Yes, Cass is an agent, but in fulfilling the duties given to it by its principal, it should be following the

UCC, and since we weren't able to talk about it, it's my only other way to get it in front of the jury, and I wouldn't have a problem with limiting some of the definitions in 23, our instruction 23.

I tried to include just those words that would have come up in trial because certain words have specific meanings in this type of freight bill transaction, bill of lading, defines what it is, but — we can limit some of those.

But, obviously, what's really important to us is our instruction 24 which is UCC 9-406 which says after notice, you pay the assignee, and that's the key to this whole case.

Now, I really think we would be substantially prejudiced if we could not discuss the UCC in front of the jury.

The Court: The Court did not include the UCC instructions because of its prior finding that the UCC is not applicable because the defendant is not an account debtor, and therefore it will not include an instruction on the UCC.

Your objection is noted.

*The errors of the majority opinion.* The majority states: "Nationwide has not identified any legal authority extending the obligations of § 9-406 to the agent of an account debtor." The principle of agency at the heart of Nationwide's case is that an agent for paying the debt of its principal is bound to pay it if the principal is bound to pay it and acts improperly in holding up payment to obtain its own advantage.

Both sides acknowledge, and the Restatement counsels, that to determine whether Cass acted improperly, "the real

question is whether [its] conduct was fair and reasonable under the circumstances." Restatement (Second) of Torts § 767, comment (g), subsection j. The Restatement further explains that "[r]ecognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not 'sanctioned by the rules of the game.' " *Id.*

"The jury determines whether [Cass's] interference with [Nationwide's] advantageous relation was intentional or not." *Id.* at subsection l. Nationwide argues that U.C.C. § 9-406 constitutes the "rules of the game" for the factoring industry. Properly instructed, the jury could have found that the shipper clients of Cass had an absolute duty under the U.C.C. to pay the carriers which shipped their goods; that Nationwide had been assigned all the rights of such carriers; that Cass had no right to demand a payment or any agreement as a condition for discharging a debt it was being paid to discharge and had agreed to discharge; and that Cass had acted unjustifiably to injure Nationwide as its competitor.

*The importance of the issue*. Cass contends strenuously that Nationwide's position would destroy its business:

> Under Nationwide's outrageous view of UCC § 9-406, the liability of payment agents would increase astronomically. Nationwide's position would require every payment service to guarantee the obligation of the account debtor. Accordingly, if the account debtor were unable to fulfill its obligation, the payment service or agent would have to step in and make good on the debt. This result likely would cause the end of the payment service industry because account debtors' agents could not afford to assume the debt or would have to increase their fees beyond ability of the account debtor to afford the payment service.

Neither result is acceptable. Payroll payment services would be deemed to "stand in the shoes" of the employer, thereby making the payment service the obligor of the employees' wages in the event the employer cannot pay. Likewise, banks that offer bill paying services would also be deemed to "stand in the shoes" of the customer so that if the customer cannot pay the bills, the bank would have to make good on the debt. These two simple examples demonstrate the absurdity of Nationwide's position and the reckless nature with which it urges this court to adopt it.

To the contrary, Cass's position, upheld, would put a severe crimp in the credit functioning of factors. Cass's position is that the paying agent of an account debtor may hold up the factor, may get something for nothing, and without offering any consideration in exchange may walk away with a hold-harmless agreement. The account debtor itself could not get such an agreement as a condition for payment; the account debtor, making a mistake as to the entity it pays, has to pay twice. U.C.C. § 9-406. The account debtor's agent is not in a better position. Of course, the agent does not step into its principal's shoes in the sense that it must make payment if its principal defaults. The agent is in the principal's shoes in the sense that it cannot insert conditions of its own before making payment.

Cass's two "simple examples" limp. If the payroll service would not pay an employee unless he deposited his check in a particular bank or agreed to hold the payroll service harmless if it should mistakenly pay the wrong employee, or if a bank would not pay a bill unless the payee deposited the payment with it, they would act without justification. Obviously, a payroll service could not demand a hold-harmless agreement be signed by every employee it paid. Obviously, a bank paying a customer's bills could not require each recipient of a check to agree to hold the bank harmless if the bank erred.

An illustration contrary to Cass's position comes from FRED H. MILLER & ALVIN C. HARRELL, THE LAW OF MODERN PAYMENT SYSTEM AND NOTES (West Group 2002): "[I]f a payor bank refuses to pay and (dishonors) an item that is properly payable, it may be liable for wrongful dishonor under [U.C.C.] § 4-402, unless it has some additional defense or excuse." *Id.* at 406. "In other words, the bank cannot simply refuse to pay at its own discretion, without a further reason." *Id.* at 418. Cass and Nationwide's relationship is analogous to that of a bank and the presenter of the check for payment. Of course, the freight invoice assigned to Nationwide is not a negotiable instrument. There may be defenses to payment. But if there were defenses, it was incumbent on Cass to plead and prove them. Cass has a way of protecting itself from ruin: obtain a hold-harmless agreement from the shipper for whom it acts.

*Whether the district court's errors were prejudicial.* "An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Swinton v. Potomac Corp.*, 270 F.3d 794, 805 (9th Cir. 2001). It is unclear that this jury would have reached the same verdict. A crucial element of the torts at issue requires Nationwide to show that Cass intentionally and improperly interfered with Nationwide's business relationships. Nationwide's theory of the case — that Cass acted improperly by conditioning payment on a hold-harmless agreement — could not be understood without evidence of the shippers' payment obligations under the U.C.C. Nationwide was fatally prejudiced by the court's failure to grasp the correctness of its objections.